Evelyn V. Keyes, Justice
Appellant, L.A.A. a/k/a L.A.A.-M. ("Father"), asserts six issues challenging the legal and factual sufficiency of the evidence supporting the trial court's final decree terminating his parental rights to his three children, B.D.A., L.A.A.-M., and J.X.A. The panel's opinion dated July 24, 2017, reversed the trial court's decree and remanded for further proceedings. The Texas Department of Family and Protective Services ("the Department") moved for rehearing and en banc reconsideration of that opinion. We now grant the motion for rehearing, withdraw the July 24, 2017 opinion and judgment, and issue this opinion and judgment in their stead.[1]
Because we conclude that the record contains legally and factually sufficient evidence to support the trial court's having formed a firm belief or conviction that termination under Family Code section 161.001(b)(1) and (2) was warranted, we affirm the decree of the trial court.
*350 Background
B.D.A., the eldest child involved in this suit, was born in October 2009 and is eight years old. Her brother, L.A.A.-M., was born in March 2011 and is now six. The youngest child, J.X.A., is a boy who was born in November 2012 and has just turned five years old.
In July 2012, before J.X.A. was born and when B.D.A. and L.A.A.-M. were two-and-a-half years and one year old, respectively, Father committed the first-degree felony offense of aggravated robbery with a deadly weapon and was held in jail until his trial. In February 2013, he was sentenced to fifteen years in prison. Father was still serving this sentence at the time of the final hearing in this termination case.
On December 15, 2014, in an effort to investigate a referral that the Department had received regarding abuse and neglect of B.D.A., L.A.A.-M., and J.X.A. by their mother,[2] the Department filed an application for an ex parte order to place the family on a Child Safety Check Alert List. The Department alleged that it was unable to locate the family-including the mother, the father, and the maternal grandmother-so that it could investigate the reports. The trial court signed an order on December 15, 2014, finding that "[t]he Department has received a report of child abuse or neglect and is trying to investigate," that "[t]he Department has exhausted all means available to [it] for locating the Family and has been unsuccessful," and that the Department filed an application which included "[a] summary of the report of child abuse or neglect the Department is attempting to investigate and the Department's efforts to locate the family." The trial court "APPROVE[D] the Application and ORDER[ED] the HOUSTON POLICE DEPARTMENT to notify the Texas Crime Information Center to place the family on the Child Safety Check Alert List."
The children were removed from their mother's care in June 2015, following a referral of neglectful supervision of L.A.A.-M., who is hearing-impaired and autistic, resulting in his hospitalization for a "head scalp injury from a dog bite." The affidavit accompanying the Department's first amended petition asserted that, at the time of this incident, "the mother's whereabouts were unknown." When she arrived at the hospital, she "appeared to be intoxicated," and her "speech was slurred and she appeared lethargic." The Department investigator also averred that, among other indicators of intoxication, "mother fell asleep twice while answering hospital staff's questions" and that "it took two nurses to physically assist mother to the new room because mother could not walk without wobbling."
The Department's investigator spoke with the mother during L.A.A.-M.'s hospitalization, and, among other statements, the mother expressed her belief that Father "is incarcerated in Amarillo, Texas, and will be there for a long time," but she was unsure why he had been incarcerated. The Department's investigator averred that Father was actually serving a fifteen-year sentence in Huntsville, Texas.
The affidavit supporting the Department's first amended petition also included previous referrals of neglect and abuse of the children by the mother. An investigation into the mother's neglectful supervision of these children, conducted between November 27, 2012, and May 1, 2013, was disposed of with the notation "reason to *351 believe"; two separate investigations into the mother's physical neglect and neglectful supervision of the children, conducted between July 17, 2014, and October 22, 2014, and between October 17, 2014, and December 18, 2014, were disposed of as "unable to complete" because the family could not be located.
The Department asserted that it had sought emergency temporary orders following the latest referral, in June 2015, on the ground that the mother could not care for the children upon L.A.A.-M.'s release from the hospital and "[t]he relative placement for [B.D.A. and J.X.A.] can no longer take care of them." The Department investigator also averred that, when it was determined that the relative keeping B.D.A. and J.X.A. while L.A.A.-M. was in the hospital could only keep them for a few weeks, he asked mother "to give me names, date of birth, and social security numbers for possible placement option[s] for her children." He stated that mother told him "all of the people she would want to be considered either [have] a criminal background or [do not] want to be involved with CPS." The First Amended Petition listed both the mother and Father as parties to be served, noting that Father was "[t]he alleged father of the children."
On June 25, 2015, the trial court signed an order containing the following findings:
3.1 Having examined and reviewed the evidence, including the sworn affidavit accompanying the petition and based upon the facts contained therein, the Court finds that all reasonable efforts, consistent with time and circumstances have been made by [the Department] to prevent or eliminate the need for removal of the children the subject of this suit from the home and to make it possible for the children to return home, but the continuation in the home would be contrary to the children's welfare.
3.2 The Court finds that:
3.2.1. there is an immediate danger to the physical health or safety of the children or the children have been the victims of sexual abuse and that continuation in the home would be contrary to the children's welfare; and
3.2.2. there is not time, consistent with the physical health or safety of the children and the nature of the emergency, to hold an adversary hearing or to make reasonable efforts to prevent or eliminate the need for removal of the children.
The trial court found that it was in the children's best interests to name the Department as their temporary sole managing conservator.
On July 9, 2015, the trial court also signed a "Temporary Order Following Adversary Hearing."[3] It found that Father was not notified of the hearing and did not appear. Accordingly, the trial court signed an order appointing an attorney ad litem for Father, and the order stated that "[t]he attorney ad litem shall examine the record in this case and may present evidence to the court concerning the diligent effort to identify, locate, or serve said party." The trial court's temporary order also contained the following findings:
3.1 The Court finds there is sufficient evidence to satisfy a person of ordinary prudence and caution that: (1) there was a danger to the physical health or safety of the children which was caused by an act or failure to act of the person entitled to possession and for the children to remain in the home is contrary *352 to the welfare of the children; (2) the urgent need for protection required the immediate removal of the children and makes efforts to eliminate or prevent the children's removal impossible or unreasonable; (3) notwithstanding reasonable efforts to eliminate the need for the children's removal and enable the children to return home, there is a substantial risk of a continuing danger if the children are returned home.
....
3.2 The Court finds that placement of the children with the children's noncustodial parent or with a relative of the children is inappropriate and not in the best interest of the children.
The trial court further ordered that the Department continue as the children's temporary managing conservator. The trial court ordered both the mother and Father to "execute an authorization for the release of [their own] and the children's (if needed) past, current or future medical and mental health records" and "to provide the Department with a list of the names and addresses of all physicians, psychologists, or other healthcare providers who have treated [them] or the children." Finally, the trial court ordered Father to "submit the Child Placement Resources Form provided under [Family Code section] 261.307, if the form has not previously been provided and provide the Department and the Court the full name and current address or whereabouts and phone number of any and all relatives of the subject children ... with whom the Department may place the subject children during the pendency of this suit, pursuant to § 262.201, Texas Family Code."
On July 14, 2015, the Department filed its "Second Amended Petition for Protection of Child for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship," again naming Father as the children's "alleged" father and requesting service on him in prison or in court. The petition included the requests that the Department be given custody of his children; that Father's paternity be established; and if the court found that the parent-child relationship existed, and if "reunification with the father cannot be achieved," that Father's parental rights be terminated under one or more of the following Texas Family Code sections: section 161.001(b)(1)(D) (knowingly placing or allowing children to remain in conditions or surroundings that endangered their physical or emotional well-being); (E) (engaging in conduct or knowingly placing the children with person who engaged in conduct endangering their physical or emotional wellbeing); (F) (failing to support children in accordance with parent's ability for one year within six months of the filing of petition); (N) (constructively abandoning children for not less than six months, including not regularly visiting them or maintaining significant contact with them and demonstrating inability to provide them with safe environment); (O) (failing to comply with provisions of court order establishing actions necessary for parent to obtain return of children who had been in Department conservatorship for not less than nine months after their removal from their parent for abuse or neglect); and (Q) (knowingly engaging in criminal conduct that resulted in parent's conviction for offense and confinement and inability to care for children for not less than two years from filing of petition). The petition was served on Father's appointed attorney.
The second amended petition again requested that "each Parent, Alleged Father, or Respondent" "submit the Child Placement Resources Form provided under § 261.307" and "Provide the Department and the Court the full name and current address or whereabouts and phone number *353 of any and all relatives of the children" with whom the Department might place them during pendency of the suit. And it requested that each parent "accurately identify that parent's net resources and ability to pay children support" and provide evidence of health insurance available for the children, their medical history, and their health care providers. It warned both parents that their parental rights might be subject to termination unless the parent was "willing and able to provide the children with a safe environment."
On August 4, 2015, the Department filed a status report indicating that it was making efforts to locate the missing parents by collecting "the alleged father's names for the children"; that the Department had attempted to serve Father in person on July 15, 2015; and that the Department had "attempted to place the children with relatives before [resorting] to foster care. There are no identified relatives by the mother that would be eligible to keep the children." The report also contained information regarding the parents' family plan of service and medical, dental, and psychological information for each child. Specifically regarding Father, the Department stated that he needed to submit to DNA testing and that "[a] Family Plan of Service will be requested after DNA confirms paternity."
On August 20, 2015, the trial court held a status hearing at which Father appeared through his attorney of record. At that hearing, the Department presented a family service plan directed to both parents, which included a description of the events that brought Father's children to the Department's attention in June 2015. The family service plan further outlined the Department's initial concerns regarding the children, including that the mother suffered from anxiety, depression, and insomnia but had no medication; she tested positive for cocaine and marijuana; she was leaving the children with inappropriate caregivers; she had been involved in four previous CPS referrals and had a history of fleeing from the Department; and she was not associating with her family and had limited outside support.
The court-ordered family plan required Father not only to submit to DNA testing to verify that he was the children's father but to "learn new behaviors that promote cooperation, stability, and a sense of self-worth among family members," to participate in therapy, to demonstrate an ability to "provide basic necessities such as food, clothing, shelter, medical care, and supervision" for the children, to "build a support network that will help ensure the safety of the child[ren]," and to "maintain housing that is safe and free of hazards and provide protection, food, and shelter for the children and family," and to "actively cooperate in fulfilling the agreed upon safety plan."
The trial court found, in its August 20, 2015 status order, that "all parties entitled to citation and notice have been served" and that the "service plans filed by the Department ... are reasonable, accurate, and in compliance with the previous orders of the Court." It further found that Father had not yet reviewed his service plan. And the trial court found that Father had not completed the Child Placement Resource Form or filed it with the court as required by Family Code section 261.307, and it again ordered Father to do so.
On November 9, 2015, the Department filed another permanency report with the trial court, outlining the progress of the case and details of the children's placements at that time. This report stated that Father's paternity had been established through DNA testing. On November 19, 2015, the trial court ordered a partial nonsuit as to the "Unknown Father" named in *354 the Department's petition. The trial court also signed an order stating that a hearing was held on November 19, 2015, to determine the parentage of the children. The trial court found that Father appeared through his attorney, and it adjudicated Father as the father of B.D.A., L.A.A.-M., and J.X.A.
Finally, the trial court also signed a permanency hearing order following the hearing on November 19, 2015. The trial court made the following findings:
2.1 The Court, having reviewed the pleadings and considered all evidence and information required by law, including all service plans and Permanency Progress Reports filed by the Department, finds that all necessary prerequisites of the law have been satisfied....
2.2 The Court has reviewed service plans, permanency report and other information submitted to the court to determine the safety and well-being of the children. ... The Court finds that the Department has made reasonable efforts, as identified in its service plans and/or Permanency Progress Reports, to finalize the permanency plan that is in effect for each child.
....
2.4 The Court has evaluated the Department's efforts to identify relatives who could provide the children with a safe environment if the children are not returned to a parent ... and to obtain the assistance of each parent to provide information necessary to locate an absent parent, alleged father, or relative of the child. The Court has further reviewed the efforts of the parent, alleged father or relative before the Court in providing information necessary to locate another absent parent, alleged father or relative of the children pursuant to § 263.306(a-1)(2)(B), Texas Family Code.
2.5 The Court has evaluated the parties' compliance with temporary orders and the service plan, and the extent to which progress has been made toward alleviating or mitigating the cause necessitating the placement of the children in foster care....
The trial court specifically found that Father "has not demonstrated adequate and appropriate compliance with the service plan." The trial court found that B.D.A. and J.X.A. were placed in a "relative's home" and that L.A.A.-M. was placed in "substitute care." The trial court found that neither parent was willing or able to provide the children with a safe environment and thus "[t]he children continue to need substitute care and the children['s] current placement[s are] appropriate for the children's needs."
On February 12, 2016, the Department filed another permanency report with the trial court. This report again provided information regarding the children's placements, current medical and mental health needs, and parental progress.
On February 26, 2016, the mother's attorney filed a counter-petition, also seeking to have Father's paternity to the children established and asking the trial court to name the mother as the children's managing conservator. The counter-petition stated, "If Co-Respondent, [Father's], paternity is established and [he] is appointed possessory conservator, he should be ordered to ... pay guideline child support."
Following a hearing on March 3, 2016, the trial court signed another permanency hearing order finding that Father appeared through his attorney of record. The trial court also found, again, following review of the "pleadings and ... all evidence and information required by law, including all service plans and Permanency Progress Reports filed by the Department," that *355 Father had not demonstrated adequate and appropriate compliance with the service plan and that he was not willing or able to provide the children with a safe environment. In its March 3, 2016 order, the trial court allowed the mother to proceed with visitation with the children.
On May 2, 2016, the Department filed another Permanency Report. In its May 24, 2016 Permanency Hearing Order, the trial court again found that Father had not demonstrated adequate and appropriate compliance with the service plan. The trial court also ordered that the Department conduct a home study for a "fictive kin" placement-a friend with whom the mother intended to live.
In June 2016, finding that the mother had made significant progress in completing her family service plan, the trial court allowed the children to visit at the mother's residence with the Department's supervision. Subsequently, following a status hearing in August 2016, the trial court ordered that the children were to be returned to the mother by August 19, 2016. However, the children were again removed on an emergency basis and, on October 5, 2016, the trial court vacated its previous order allowing the children to live with their mother. The children were then placed with different foster families, and the Department sought to terminate the parental rights of both parents and to be named as the children's permanent managing conservator.
On December 15, 2016, the trial court held a trial. Father again appeared through his attorney of record and announced ready. The Department presented evidence of Father's conviction for aggravated robbery with a deadly weapon. The children's mother voluntarily relinquished her parental rights. Bridget Sharkey, the caseworker who had been working on the case for more than a year, testified that she believed termination of the mother's rights based on voluntary relinquishment was in the children's best interest because the Department "did try numerous times to work out arrangements to support the primary goal at the time of family reunification. Unfortunately, once the kids were placed with the mother, the kids' care started deteriorating.... The mom was not able to physically, financially, or emotionally be there for the children." Sharkey stated, "The children are actually getting more support in the placement that they are in at this time." She emphasized the problems that the mother had had throughout the pendency of the case, including the neglectful supervision that had occurred, and stated that "none of the dangers were alleviated that brought the children into care." Sharkey testified that the Department believed "that the children's best interest would be to stay in the placements that they are in and eventually become adoptive into a permanent placement where they will be stable and their needs can be met."
Sharkey then responded to the questions of the Department's counsel as follows:
Q. Where are the children currently placed?
A. The children are all in separate placements. They are all in foster homes. [L.A.A.-M.] is close to Austin and the other two children are in Harris and Fort Bend County.
Q. And the children are doing well in each of their placements?
A. Yes. All of their needs are being met in each individual placement.
Q. [L.A.A.-M.] has special needs, correct?
A. Yes.
Q. He's deaf?
A. Yes.
*356 Q. He has-
A. I'm sorry. He has moderate hearing loss in one ear, severe hearing loss in the other ear. He's not completely deaf, but there is severe hearing damage.
Q. And his current placement is able to, in fact, much better than any other placement, address those needs, correct?
A. Yes.
Q. Okay. And so, just to follow up, you believe it's in the best interest that the parental rights be terminated today?
A. Yes.
Q. And we believe that it would provide more permanency for the children?
A. Correct, yes.
Regarding Father, the caseworker testified that the court-ordered DNA testing established his paternity as to all three children. She further testified that she reached out to the father and that "[h]e was mailed a family plan of service as well as a letter to notify him of the case." However, Father never "reached out" to the caseworker. The caseworker testified that, to her knowledge, Father never sent any letters or cards to his children. Sharkey testified that she believed it was in the children's best interest to terminate Father's parental rights because engaging in criminal conduct could endanger the children's safety and did not demonstrate good parenting skills. Sharkey again testified that termination of both parents' rights would provide more permanency for the children. Sharkey also testified that Father was sentenced in 2013 to fifteen years' confinement and that his release date was in 2028, which was then more than two years in the future, and his engaging in criminal conduct could endanger his children's safety.
Father's trial counsel questioned the caseworker regarding whether she could demonstrate that Father actually received the family service plan. The caseworker testified that the Department sent it by certified mail, but she did not bring the receipt to court. She also acknowledged that she had not spoken with Father personally. Father's counsel did not present any evidence regarding Father's ability to provide for the children's care while he was incarcerated.
Finally, the child advocate testified. She stated that she had worked on the case since November 13, 2015, that she was aware of all of the "ups and downs" of the case, and that she had seen the children in the different placements. The child advocate also testified that termination of both parents' rights was in the children's best interest, stating, "We did work with the mother, and she wasn't able to alleviate any of the concerns that brought the children into care including drug use, instability, emotional instability, [and] lack of a support system." The child advocate also noted the mother's history "of running from CPS and not following through." She observed that the children were young, that L.A.A.-M. "is in a placement that will hopefully become adoptive. It can meet all of his needs and the other two children are basic level children that deserve to find permanency."
The "Final Decree of Termination" issued on January 10, 2017. The trial court found "by clear and convincing evidence that termination of parent-child relationship between [Father] and the children ... is in the children's best interest." It further found clear and convincing evidence to support termination of Father's parental rights under subsections (D) and (E) of 161.001(b)(1) of the Texas Family Code for endangering his children's welfare, (N) for *357 constructively abandoning them, (O) for failing to comply with the provisions of his family service plan, and (Q) for committing a criminal offense which resulted in his imprisonment and inability t o care for the children. See TEX. FAM. CODE ANN. § 161.001(b)(1) (West 2015).
Sufficiency of the Evidence Supporting the Trial Court's Predicate Findings for Termination
In his first five issues, Father challenges the sufficiency of the evidence to support the trial court's findings pursuant to Family Code section 161.001(b)(1)(D), (E), (N), (O ), and (Q).
A. Standard of Review
The burden of proof in termination of parental rights cases is "clear and convincing evidence." In re J.F.C. , 96 S.W.3d 256, 263 (Tex. 2002) (citing Santosky v. Kramer , 455 U.S. 745, 769, 102 S.Ct. 1388, 1403, 71 L.Ed.2d 599 (1982) ); see TEX. FAM. CODE ANN. § 161.001(b). " 'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014). This is an intermediate standard that falls between the "preponderance of the evidence" standard used in ordinary civil proceedings and the "reasonable doubt" standard used in criminal proceedings. Santosky , 455 U.S. at 769, 102 S.Ct. at 1403 ; State v. Addington , 588 S.W.2d 569, 570 (Tex. 1979).
When the legal sufficiency of the evidence to support termination is challenged, as here, the reviewing court looks at all the evidence in the light most favorable to the termination finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that the finding was true. In re J.O.A. , 283 S.W.3d 336, 344 (Tex. 2009) ; In re J.F.C. , 96 S.W.3d at 266. The court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. In re J.O.A. , 283 S.W.3d at 344 ; In re J.F.C. , 96 S.W.3d at 266. It should disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible. In re J.O.A. , 283 S.W.3d at 344 ; In re J.F.C. , 96 S.W.3d at 266. If, after conducting a legal sufficiency review of the evidence in the record, the court determines that no reasonable factfinder could have formed a firm belief or conviction that the matter to be proved was true, the court must conclude that the evidence on that matter is legally insufficient. In re J.O.A. , 283 S.W.3d at 344 ; In re J.F.C. , 96 S.W.3d at 266.
In a factual sufficiency review, the court weighs the evidence favoring the decision against the evidence disfavoring it. In re J.O.A. , 283 S.W.3d at 345 ; In re J.F.C. , 96 S.W.3d at 266 ; In re R.W. , 01-11-00023-CV, 2011 WL 2436541, at *9 (Tex. App.-Houston [1st Dist.] June 16, 2011, no pet.) (mem. op.) ("For legal sufficiency purposes, we consider those factors that support the finding that termination was in the child's best interest. We then balance the factors presented in the legal sufficiency argument against the evidence that undercuts any finding that termination is justified under the statute."). The evidence is factually insufficient in a parental rights termination case if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction regarding termination. In re J.O.A. , 283 S.W.3d at 345 ; In re J.F.C. , 96 S.W.3d at 266. The court of appeals should "explain in its opinion *358 'why it has concluded that a reasonable factfinder could not have credited disputed evidence in favor of the finding.' " In re J.O.A. , 283 S.W.3d at 345 ; see In re J.F.C. , 96 S.W.3d at 266-67.
A single predicate finding under Family Code section 161.001(b)(1) is sufficient to support a judgment of termination when there is also a finding that termination is in the child's best interest. In re A.V. , 113 S.W.3d 355, 362 (Tex. 2003) (affirming termination decree based on one predicate without reaching second predicate found by factfinder and challenged by appellant). Thus, if multiple predicate grounds are found by the trial court, the Texas courts will affirm on any one ground because only one is necessary for termination of parental rights. See In re T.G.R.-M. , 404 S.W.3d 7, 13 (Tex. App.-Houston [1st Dist.] 2013, no pet.).
B. Analysis
We first consider whether there is legally and factually sufficient evidence to support termination of Father's parental rights under Subsection (Q). Family Code section 161.001(b)(1)(Q) provides that the court may order the termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has "knowingly engaged in criminal conduct that has resulted in the parent's: (i) conviction of an offense; and (ii) confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition." TEX. FAM. CODE ANN. § 161.001(b)(1)(Q).
When a party seeking termination has established that the incarcerated parent will remain in confinement for the requisite period, the parent must then produce some evidence as to how he would provide or arrange to provide care for the child during his incarceration. In re H.B.C. , 482 S.W.3d 696, 702 (Tex. App.-Texarkana 2016, no pet.) ; Hampton v. Tex. Dep't of Protective & Regulatory Servs. , 138 S.W.3d 564, 567 (Tex. App.-El Paso 2004, no pet.) ; In re Caballero , 53 S.W.3d 391, 395-96 (Tex. App.-Amarillo 2001, pet. denied). If the parent meets that burden of production, the party seeking termination then has the burden of persuasion to show that the parent's provision or arrangement would not satisfy the parent's duty to the child. In re H.B.C. , 482 S.W.3d at 702 ; In re E.S.S. , 131 S.W.3d 632, 639-40 (Tex. App.-Fort Worth 2004, no pet.) ; see also Hampton , 138 S.W.3d at 567 (holding that party seeking termination must persuade trial court that parent's stated arrangements would not satisfy parent's duty or obligation to child).
The Department named Father as a respondent in its petition filed on July 14, 2015. At trial, the Department presented evidence that, in 2012, Father committed the first-degree felony offense of aggravated robbery with a deadly weapon; that he was sentenced to fifteen years' confinement; and that his release date is more than two years from the date the petition was filed. The trial court signed its final decree of termination on January 10, 2017.
The record demonstrates that Father has not adequately cared for or supported the children and that he has made no arrangements for their care during his incarceration other than leaving them with their mother, who subjected the children to endangerment and neglect and who ultimately relinquished her rights to the children. The caseworker testified that Father had no contact with the children or with the caseworker while this case was pending. He did not make any efforts to produce some evidence as to how he would provide or arrange to provide care for the children during his incarceration. See In re H.B.C. , 482 S.W.3d at 702.
*359 This evidence supports the trial court's forming a firm belief or conviction that Father knowingly engaged in criminal conduct that resulted in his conviction of aggravated robbery, his imprisonment, and his inability to care for the children for not less than two years from the date of the filing of the petition. See TEX. FAM. CODE ANN. § 161.001(b)(1)(Q) ; In re A.V. , 113 S.W.3d at 360-61. Thus, we conclude that there is legally and factually sufficient evidence to support termination of Father's parental rights to all three children under subsection 161.001(b)(1)(Q), if there is likewise evidence that termination is in the children's best interest.
Additionally, we observe that the trial court also made findings supporting termination of Father's parental rights under several other subsections of 161.001(b)(1), including subsections D (endangering conditions), E (endangering conduct), and N (constructive abandonment). See TEX. FAM. CODE ANN. § 161.001(b)(1). While only one basis for termination must be proved, there was evidence that Father left the children in endangering conditions by leaving them with their mother, a drug addict who demonstrated no ability either to overcome her addiction or to provide safe surroundings for the children. Thus, the record indicates that Father's criminal conduct left the children in a situation in which they suffered from neglect and, in L.A.A.-M.'s case, injury. See In re S.M.L. , 171 S.W.3d 472, 479 (Tex. App.-Houston [14th Dist.] 2005, no pet.) (holding that parent's imprisonment is factor that factfinder may consider because incarceration means that parent is absent from child's daily life and unable to provide support, negatively impacting child's living environment and emotional well-being). This evidence further justifies termination of Father's parental rights under subsections (D) and (E) of section 161.001(b)(1).
Moreover, there was unrebutted evidence that Father constructively abandoned the children by failing to reach out to or communicate with them or to take any steps to provide them with a safe environment, as required by his family service plan during the entire time the children were in the Department's care and during the pendency of the termination proceedings. There was also uncontroverted evidence that the children had been in the custody of the Department for more than nine months after their removal from their mother's home for abuse and neglect, justifying termination of Father's parental rights under subsection (N). See TEX. FAM. CODE ANN. § 161.001(b)(1)(N) (providing that termination is appropriate when there is clear and convincing evidence that child has been in Department's custody for at least six months; that it made reasonable efforts to return child to parent; that parent has not regularly visited or maintained significant contact with child; and that parent has demonstrated inability to provide child with safe environment).
Thus, we conclude that the evidence was legally and factually sufficient to support, at a minimum, at least one predicate finding under Family Code section 161.001(b)(1). See In re A.V. , 113 S.W.3d at 362. We overrule Father's issues on these grounds and turn to the question of whether the Department proved that termination of Father's parental rights was in the best interest of the children.
Sufficiency of the Evidence Supporting the Trial Court's Best Interest Finding
In his sixth issue, Father argues that the evidence was legally and factually insufficient to support the trial court's finding *360 that termination of his parental rights was in the best interest of the children.
A. Standard of Review
In addition to a predicate violation, the Department must establish by clear and convincing evidence that termination is in the best interest of the children. TEX. FAM. CODE ANN. § 161.001(b)(2).
There is a strong presumption that the best interest of the child will be served by preserving the parent-child relationship. In re J.F.C. , 96 S.W.3d at 294 ; see TEX. FAM. CODE ANN. § 153.131(b) (West 2014). Because of the strong presumption that maintaining the parent-child relationship is in the best interest of the child and the due process implications of terminating a parent's rights without clear and convincing evidence that termination is in the child's best interest, "the best interest standard does not permit termination merely because a child might be better off living elsewhere. Termination should not be used to merely reallocate children to better and more prosperous parents." In re W.C. , 98 S.W.3d 753, 758 (Tex. App.-Fort Worth 2003, no pet.).
The factfinder may consider a number of factors to determine the best interest of the child, including the desires of the child, the present and future physical and emotional needs of the child, the present and future emotional and physical danger to the child, the parental abilities of the people seeking custody, programs available to assist those people in promoting the best interest of the child, plans for the child by those people or by the agency seeking custody, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not appropriate, and any excuse for the acts or omissions of the parent. Holley v. Adams , 544 S.W.2d 367, 371-72 (Tex. 1976).
In some cases, undisputed evidence of only one factor may be sufficient to support a finding that termination is in the best interest of the child; in other cases, there could be "more complex facts in which paltry evidence relevant to each consideration mentioned in Holley would not suffice" to support termination. In re C.H. , 89 S.W.3d 17, 27 (Tex. 2002). A "best interest" analysis is not limited to the Holley factors; other factors may be considered. Holley , 544 S.W.2d at 372 ; see In re C.H. , 89 S.W.3d at 27.
B. Analysis
Here, multiple factors support the trial court's finding that termination of Father's parental rights was in the children's best interest. There was direct evidence that Father committed a violent felony that resulted in his imprisonment when his oldest child, B.D.A., was not-yet three and his youngest, J.X.A., had not yet been born. He remained in prison at the time of trial and the Department presented evidence that his sentence did not expire until 2027.[4] Thus, he had been and will continue to be imprisoned for the majority of the children's childhoods. The trial court made multiple orders to effectuate the Department's ability to locate Father, establish his paternity through genetic testing, and otherwise provide him with notice of the Department's case. Although Father participated in the DNA testing to establish his paternity, Sharkey testified that she was not aware of any communications between Father and the children and that *361 he had never "reached out to her." Nothing in the record demonstrated that Father had any willingness or ability to provide his children with a safe environment, and, instead, the children were left exclusively in the care of their mother who endangered their wellbeing and ultimately relinquished her parental rights to the children. By contrast, both Sharkey and the child advocate testified that the children's current placements were meeting their needs. They both asserted that termination would best afford the children an opportunity for permanence, referencing the extensive efforts that the Department had made to work with the mother-including reuniting the family briefly and searching, albeit fruitlessly, for a family or fictive kin placement for the children.
Regarding the children's ages and physical and mental vulnerabilities, they were seven, five, and four at the time of trial. Thus, the children's young ages render them vulnerable if left in the custody of a parent unable or unwilling to protect them or to attend to their needs. See TEX. FAM. CODE ANN. § 263.307(b)(1) (West Supp. 2017); Holley , 544 S.W.2d at 371-72 ; In re J.G.M. , No. 04-15-00423-CV, 2015 WL 6163204, at *3 (Tex. App.-San Antonio Oct. 21, 2015, no pet.) (mem. op).
Evidence regarding the circumstances of harm to the children, including current and future danger to the children and the family's history, weigh in favor of terminating Father's parental rights. See TEX. FAM. CODE ANN. § 263.307(b)(2), (3), (7). He committed a violent crime resulting in a lengthy imprisonment and made no efforts to provide a safe environment for his children during his incarceration. Rather, the children were left in the care of their mother, who had problems with drug abuse and was very unstable. She was repeatedly referred to the Department for neglectful supervision of the children and eventually relinquished her parental rights. Father never contacted Sharkey-the children's caseworker for more than year-to obtain information regarding the children or to communicate his plans or desires for the children. See Adams v. Tex. Dep't of Family & Protective Servs. , 236 S.W.3d 271, 280 (Tex. App.-Houston [1st Dist.] 2007, no pet.) (parent's history of failing to provide children with stable and nurturing environment demonstrates termination of parental rights in best interest of children); In re T.G.R.-M. , 404 S.W.3d at 15 (noting that each time parent was jailed, parent was absent from child's life and unable to provide for child's physical and emotional needs).
Father argues that the children are placed in separate foster homes. However, both the Department caseworker and the child advocate testified that the children's current placements were in their best interests and that the placements were meeting the children's needs. Sharkey testified that the current placement of L.A.A.-M., who is both autistic and profoundly hearing-impaired, was much better able to address his special needs than any other placement. The child advocate also testified that L.A.A.-M.'s placement in particular would hopefully become adoptive and that all of the children deserved a chance at finding permanent homes. This would not be possible if Father maintained his parental rights. Father cannot point to any evidence in the record that he was willing or able to provide for the children's welfare.
Father also argues that the caseworker, Sharkey, never spoke with him. However, numerous orders of the trial court contained findings that the Department made efforts to serve Father with proper notice and that he was served with the petition and family service plan. Sharkey testified to this fact as well. Furthermore, the record *362 indicates that he was represented by counsel beginning on July 9, 2015, that both his attorney and the Department made efforts to identify him, to serve him with notice, to establish his paternity to the children, and to provide him with information regarding the case. According to the trial court's findings in its status order, Father's attorney appeared on his behalf at every hearing, including the final hearing. The trial court's orders also contain numerous findings that Father was not making adequate progress with his family plan of service and could not provide the children with a safe environment.
In In re V.V. , an en banc panel of this Court found both legally and factually sufficient support for termination in a record similar to the one presented here. 349 S.W.3d 548, 557-58 (Tex. App.-Houston [1st Dist.] 2010, pet. denied) (en banc). There, the trial transcript consisted of five pages of testimony, in which the caseworker testified the father was incarcerated when the case began, was personally served, had contact with the Department on one occasion when his DNA test was conducted, had a criminal record, made no contact with the agency, and made no attempt to check on the welfare of his child. Id. at 552, 579. The caseworker further testified that the child's current family had provided a "very stable" environment for the child and that it was in the child's best interest for her to remain in their care and not in the care of the father. Id. at 552. The father had engaged in conduct that endangered the child and had an extensive criminal history. Id.
On that record, the Court found enough evidence to conclude that the father endangered his child and that termination of his parental rights was in the child's best interest. Id. at 557-58. In its best interest analysis, the Court reasoned the evidence was sufficient to conclude that the child was not bonded to the father "because he has not taken care of her since her birth," the father's incarceration "leaves the child without a stable environment and without a reliable source of food, clothing, shelter, and emotional support," and the father had failed to seek information about his child's well-being or about being reunified with her. Id. at 558.
Similar reasoning compels the same conclusions in this case. See In re J.O.A. , 283 S.W.3d at 344 ; In re J.F.C. , 96 S.W.3d at 266. Father committed a dangerous felony when his children were infants or not yet born. He was convicted and sentenced. He was served and was presented with his family service plan-both via certified mail and by presenting the plan to his counsel. Father submitted to DNA testing and was provided with results showing he was the children's father. Nevertheless, he made no contact with the Department and did not attempt to communicate with or inquire about his children. He made no arrangements to provide for their care during his incarceration, other than to leave them in the care of their mother, who subjected them to extreme neglect and eventually voluntarily relinquished her parental rights. By contrast, at the time of the final hearing, all of the evidence indicated that the individual needs of each child were being met in their current placements. In particular, L.A.A.-M.'s placement was addressing his extreme special needs as a partially deaf and autistic child "much better than any other placement."
Under the legal sufficiency standard and the analysis provided by V.V. , this evidence clearly constitutes evidence sufficient to support the conclusion that termination was in the children's best interest. Father engaged in conduct which was dangerous to his children, lacked a bond with his children because he was incarcerated *363 and made no effort to communicate with them, and was unable to provide the children with a stable environment, food, clothing, shelter, or emotional support. See Holley , 544 S.W.2d at 371-72 ; see also TEX. FAM. CODE ANN. § 263.307(b)(12) (providing that parent's ability to demonstrate adequate parenting skills, including providing children with minimally adequate health and nutritional care, guidance and discipline appropriate to child's physical and psychological development, and safe physical home environment, is factor in determining best interest of child).
On the date Father is set to be released, B.D.A. will be almost eighteen, L.A.A.-M. will be sixteen, and J.X.A. will be fourteen. During none of the time prior to Father's release will the children be eligible for adoption so long as Father retains his parental rights, and during none of that time will Father be in a position to exercise his parental rights in the best interests of the children. Nor has he attempted in the past to establish any connection with the children or to provide in any way for their welfare, despite his family service plan and other court orders.
Likewise, the evidence, when balanced neutrally, was clearly sufficient to support termination under the factual sufficiency standard. See In re V.V. , 349 S.W.3d at 557-58 (finding both legally and factually sufficient evidence in support of termination where father, like Father here, was incarcerated and uninvolved in his children's lives). Weighing the evidence in favor of the trial court's decision to terminate Father's parental rights against the evidence disfavoring termination, the evidence supporting termination far outweighs any contrary evidence. See In re J.O.A. , 283 S.W.3d at 344 ; In re J.F.C. , 96 S.W.3d at 266. Father has not at any time taken an active role in the children's lives. He committed robbery with a deadly weapon and was either in jail or in prison beginning in 2012, when B.D.A. was two, L.A.A.-M. was one, and J.X.A. was not yet born. While he was incarcerated, the Department received numerous referrals of child neglect and abuse directed toward the children. He could not meet their present needs and had made no attempts do so. His only participation in the case was, essentially, to provide a DNA sample to confirm his paternity. By contrast, the Department presented testimony that the children's needs were being met by their current placements, including the special needs of L.A.A.-M. We conclude, in light of the entire record, that any disputed evidence is not so significant that the factfinder could not reasonably have formed a firm belief or conviction regarding termination. See In re J.O.A. , 283 S.W.3d at 344 ; In re J.F.C. , 96 S.W.3d at 266.
We acknowledge that the record here is sparse. Ideally, the Department would provide a more extensive trial record containing evidence presented during the various prior hearings and would thoroughly present its case in the final hearing. However, the record is sparse with respect to Father because his complete lack of contact with the children and lack of involvement with their lives leaves little to record. The record demonstrated that the majority of the Department's efforts at family reunification focused on the children's mother, as Father was a violent felon who had been incarcerated since before his third child was ever born, who had made no attempt to have contact with the children, and who had not and could not provide for their needs.
In determining whether to terminate Father's parental rights, the trial court was empowered not only to take into account the evidence presented at the final hearing but to take judicial notice of its own records, including its numerous orders *364 and the findings contained within them, requiring the Department to locate Father after the children were removed from their mother, to establish his paternity through DNA testing, and to otherwise present him with notice of the case involving his children. See Gardner v. Martin , 162 Tex. 156, 345 S.W.2d 274, 276 (1961) ("It is well recognized that a trial court may take judicial notice of its own records in a cause involving the same subject matter between the same, or practically the same, parties."); Asplundh Tree Expert Co. v. Abshire , 517 S.W.3d 320, 344 n.13 (Tex. App.-Austin 2017, no pet.) ("[A] trial court is presumed to have taken notice of its own records in a case because '[a] trial judge judicially knows what has previously taken place in the case on trial.' ") (quoting Estate of Hoskins , 501 S.W.3d 295, 310 (Tex. App.-Corpus Christi 2016, no pet.) ); C.S. v. Tex. Dep't of Family & Protective Servs. , No. 03-17-00229-CV, 2017 WL 3471072, at *3 (Tex. App.-Austin Aug. 9, 2017, no pet.) (mem. op.) ("[A] trial court may take judicial notice of its previous orders and findings of fact from the same case.") (citing In re E.W. , 494 S.W.3d 287, 300 n.12 (Tex. App.-Texarkana 2015, no pet.) and In re A.O. , No. 04-12-00390-CV, 2012 WL 5507107, at *3 (Tex. App.-San Antonio Nov. 14, 2012, no pet.) (mem. op.) ); In re K.F. , 402 S.W.3d 497, 505 (Tex. App.-Houston [14th Dist.] 2013, pet. denied) ("A trial court may take judicial notice of the records in its own court filed in the same case, with or without the request of a party."); see also In re E.C.R. , 402 S.W.3d 239, 248-49 (Tex. 2013) (considering previous order and findings of trial court, among other evidence, in determining that evidence was sufficient for trial court to find by clear and convincing evidence that child was removed for abuse or neglect, as required to satisfy Family Code section 161.001(b)(1)(O) ); In re J.E.H. , 384 S.W.3d 864, 870 (Tex. App.-San Antonio 2012, no pet.) (trial court may take judicial notice of its own records in matters that are generally known, easily proven, and not reasonably disputed, but may not take judicial notice of truth of allegations in its records); In re J.J.C. , 302 S.W.3d 436, 446 (Tex. App.-Houston [14th Dist.] 2009, pet. denied) ("[T]he trial court is presumed to judicially know what has previously taken place in the case, and the parties are not required to prove facts that the trial court judicially knows.") (internal quotations omitted). As discussed above, this record was clearly sufficient for the trial court-and for this Court-to form a firm belief or conviction that termination of Father's parental rights was warranted.
We conclude that the evidence was both legally and factually sufficient to support the trial court's finding that termination of Father's parental rights was in the children's best interest. We overrule Father's sixth issue.
Conclusion
Accordingly, we affirm the decree of the trial court.

Following the panel's decision on the Department's motion for rehearing, Justice Massengale requested en banc consideration of this case. See Tex. R. App. P. 49.7. A majority of the Court voted to deny en banc consideration. Thus, because a majority of the panel has voted to grant the Department's motion for rehearing, and a majority of this Court voted to deny en banc consideration, we dismiss the Department's motion for en banc reconsideration as moot. See, e.g. , Brookshire Bros. v. Smith , 176 S.W.3d 30, 41 (Tex. App.-Houston [1st Dist.] 2005, pet. denied).

The trial court also terminated the mother's parental rights to these three children following her voluntarily relinquishment of her parental rights. The mother is not a party to this appeal.

No transcript of this hearing, or any other status hearing, was contained in the record on appeal.

Sharkey testified that Father's sentence would expire in 2028. However, the Department also presented Father's judgment of conviction for the offense showing that he received credit for time already served, demonstrating that his sentence would expire in 2027.