**Opinion issued October 2, 2018**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-18-00291-CV

———————————

## IN THE INTEREST OF S.G.A.R., A CHILD

---

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Case No. 2017-00881J**

---

## MEMORANDUM OPINION

This parental termination appeal involves one child, whom the Texas Department of Family and Protective Services took into custody at birth. The mother contends that the evidence is legally and factually insufficient to support the finding

that termination of her parental rights is in the child's best interest.[1] We hold that legally and factually sufficient evidence supports the trial court's finding and therefore affirm.

## BACKGROUND

The mother became pregnant with Sheila in 2015.[2] For the first two trimesters of her pregnancy, the mother had no prenatal care. In late May 2016, when the mother was entering the third trimester of her pregnancy, she submitted to drug screening and tested positive for PCP. She admitted to having used and sold PCP and marijuana during the pregnancy. Three days after the mother's drug test, Sheila was born prematurely.

### The mother's history

The mother became addicted to phencyclidine (PCP) in 1999, when she was 19 years old. She has been diagnosed with borderline personality disorder and depression.

In addition to her substance abuse, the mother has an extensive criminal record. She was convicted of drug possession in 2000 and of marijuana possession in 2002. From 2004 through 2007, she received three theft convictions, the first for

---

[1] The trial court also terminated the parental rights of the father, who declined to participate in the trial court and is not a party to this appeal.

[2] This is a pseudonym. *See* TEX. R. APP. P. 9.8(b)(2).

property worth $20–$200, the second for property worth $50–$500, and, as a third-time offender, for property valued under $1500. The mother's sentences ranged from 10 to 40 days' confinement in the county jail for these crimes. The mother pleaded guilty to committing the crimes underlying these convictions.

In 2009, the mother was convicted of prostitution, unlawfully carrying a weapon, and deadly conduct. The judgments of conviction for the latter two offenses reflect that the mother was initially charged with a felony, pleaded guilty to reduced charges, and was sentenced to one year in the county jail.

The mother's most recent conviction was in 2014, for burglary of a habitation with the intent to commit theft. She pleaded guilty and was sentenced to serve two years in the state penitentiary. Shortly after her release, the mother began a relationship with Sheila's father and became pregnant with Sheila.

**The Department's pre-suit involvement with the mother**

During the summer of 2016, the mother worked services with the Department's Family-Based Safety Services [FBSS] program. She completed many of her assigned services, including psychosocial screening and parenting classes. Random drug tests, however, showed that the mother continued to use PCP during this period.

The mother participated in an outpatient substance-abuse treatment program. She was successfully discharged in August. Random drug screens from August

through November 2016 showed that she was not using illegal substances. In December, however, the mother relapsed. Drug testing showed that she had used PCP and cocaine. Around this time, the father, who had consistently tested positive for illegal drugs, told the caseworker that he and the mother were no longer together and that he was not going to participate in services. The mother continued to test positive for illegal drug use in early 2017.

**Sheila's progress**

The Department took Sheila into custody at birth. She experienced respiratory distress and feeding problems due to her premature birth, and she remained under hospital care for several weeks.

When Sheila was ready to leave the hospital, the Department placed her with the mother's aunt under a Parental Child Safety Placement Agreement. Soon afterward, though, the aunt's housing became unstable. She was evicted and could no longer care for Sheila. The Department next placed Sheila with the mother's cousin, but the cousin was unwilling to take care of Sheila permanently. This situation, coupled with the mother's ongoing substance abuse, prompted the Department to seek temporary managing conservatorship over Sheila and terminate the parents' rights in February 2017.

Sheila was placed with foster parents who also were approved for adoption. When Sheila first went into the home in the spring of 2017, she was very weak and

lethargic; at 11 months old, she still could not roll over or sit upright. She was diagnosed with failure to thrive.

By the time of trial in February 2018, the foster parents had taken Sheila to at least nine doctor's appointments, and her health had greatly improved. She could walk, and she had begun to eat solid foods. She was active, thriving, and developmentally on target for a 22-month-old child. In a November 2017 status report to the court, the Child Advocates volunteer appointed as Sheila's guardian ad litem observed that, "[Sheila] appears to be stabilizing in this placement," and "appears to be thriving and bonded to the family." The ad litem further informed the court that the foster home was meeting all Sheila's needs and that Sheila had reached the appropriate height and weight range for a child of her age.

**Pretrial proceedings**

At the initial hearing in this suit in March 2017, the trial court ordered the mother to submit to drug testing. She tested positive for PCP, cocaine, marijuana, amphetamine, and methamphetamine. After a May status hearing, the mother again tested positive for these illegal substances.

The Department devised a family service plan that required the mother to complete individual therapy; undergo a psychological assessment; complete a substance-abuse assessment; participate in a six- to eight-week parenting class as well as demonstrate skills acquired from the class; maintain stable housing and

income; refrain from engaging in criminal activity; and attend all court hearings, scheduled visitations, and permanency conferences. The plan prohibited the mother from using illegal substances and required her to demonstrate sobriety by submitting to random drug screens within 24 hours of her caseworker's request. The plan document warned that any failure to comply with a random screen would be treated as a refusal to submit and would count as a positive test result. Because of the mother's ongoing drug use, her visits with Sheila were required to take place under supervision at the CPS office. The trial court incorporated the plan into its May status-hearing order and warned the mother that her parental rights could be terminated for failure to comply with the plan.

**Trial proceedings**

The parental-rights issues were tried to the bench in February 2018. The Department introduced records of the parents' drug-testing results; certified copies of the mother's nine criminal judgments; and a certified copy of the father's criminal judgment. The trial court heard from four witnesses: the caseworker, the Child Advocate volunteer, the mother, and the foster father.

With respect to the mother's compliance with the family service plan, the caseworker testified that the mother completed the psychosocial assessment, an initial substance-abuse assessment, and rehabilitation classes but has had multiple relapses into substance abuse since then. In August 2017, the mother refused to

6

submit to drug testing. Thereafter, she failed to appear for at least nine scheduled drug tests, and the caseworker had reason to believe the mother might still be using illegal drugs.

The caseworker also testified that the parents had an incident of family violence that resulted in a criminal charge against the father. Sometime during the summer of 2017, the father punched the mother in the face, applied pressure to her neck and throat until she could not breathe, and kicked her in the head and chest multiple times. After this attack, the mother was hospitalized and underwent an MRI. The father was charged with assault—impeding breathing and or circulation, a third-degree felony. He pleaded guilty to the lesser charge of assault on a family member in November 2017. The caseworker opined that the conduct of both parents puts Sheila in danger and that the mother cannot provide Sheila with a safe and stable environment.

The Department's long-term plan is for the foster family to adopt Sheila. The caseworker observed that Sheila was significantly attached to the foster parents, and she did not have the same bond with her biological parents. The foster parents are both accountants. They have a nice home and a five-year-old child who potentially is a sibling for Sheila.

Like the caseworker, the Child Advocate volunteer opined that Sheila's mother cannot give her a safe environment. She reported that Sheila is doing well

in foster care, noting that the foster parents have a safe and stable home and that they fully meet Sheila's physical and emotional needs. Sheila is very bonded to her foster family, and her foster parents would like to adopt her. The volunteer recommended that the trial court terminate the mother's parental rights and allow Sheila to be adopted by her foster parents.

The mother testified that she has lived in her own home for three months. She babysits for her sister and goes to school. She has been receiving treatment for her depression and borderline personality disorder through MHMRA of Harris County. She qualified to receive Social Security income because of her mental illness and was expecting to receive her first check soon. She explained that she previously had uncontrolled behavior because of the disorder, but that her behavior has been "under control" since she began taking prescribed medication.

The mother acknowledged that the father pleaded guilty to the assault charge, but she denied that the father assaulted her. She claimed that the incident occurred because of a misunderstanding, that it was her fault, and that the father "didn't know better." The mother testified that she had ended her relationship with the father, but later in her testimony, she acknowledged having spoken with him the day before.

The foster father testified to Sheila's improvement since she has been with the family, that she went from being a weak, lethargic infant to a thriving toddler, "running around the house" and "growing really fast." When asked whether he and

8

his wife were willing to adopt Sheila, he responded, "Absolutely. Yes." He confirmed that he and his wife love Sheila, and he believes that allowing them to adopt Sheila would be in her best interest.

The trial court terminated the mother's parental rights on the predicate grounds that she had endangered the physical or emotional well-being of the child or knowingly placed the child with persons who did so, and that the mother failed to complete her court-ordered family service plan. *See* Tex. Fam. Code § 161.001(b)(1)(E), (O). The trial court further found that termination would be in the child's best interest. *Id.* § 161.001(b)(2).

## BEST INTEREST OF THE CHILD

In a single issue, the mother contends that the trial court's finding that termination of her parental rights was in Sheila's best interest is not supported by legally or factually sufficient evidence. The mother does not challenge the trial court's finding that she endangered Sheila's physical or emotional well-being or knowingly placed the child with persons who did so, or the finding that she failed to comply with her court-ordered family service plan.

## A. Standard of Review and Applicable Law

A parent's right to the care, custody, and control of her child is a liberty interest protected under the Constitution, and we strictly scrutinize termination proceedings on appeal. *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388,

1397 (1982); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).  Clear and convincing evidence must support an involuntary termination.  *Holick*, 685 S.W.2d at 20 (citing *Santosky*, 455 U.S. at 747–48, 102 S. Ct. at 1391–92).  Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  TEX. FAM. CODE § 101.007.

In reviewing the legal sufficiency of the evidence supporting the trial court's termination decision, the appellate court looks at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.  *In re J.F.C.*, 96 S.W.3d 256, 266 Tex. 2002).  We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, disregarding all evidence that a reasonable factfinder could have disbelieved or found to have been incredible.  *Id.* If, after conducting a legal sufficiency review of the record, we determine

that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then we must conclude that the evidence is legally insufficient.  *Id.*

In reviewing the factual sufficiency of the evidence in a parental-rights-termination case, we determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a factfinder reasonably

10

could have formed a firm conviction or belief about the truth of the matter on which the Department bore the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). We consider whether the disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

The scope of our evidentiary-sufficiency review includes all the evidence admitted at trial, as well as any other documents that the trial court properly could have considered through judicial notice. *In re B.D.A.*, 546 S.W.3d 346, 363–64 (Tex. App.—Houston [1st Dist.] 2018, no pet.). We presume that the trial court took judicial notice of its own records in a case even in the absence of a request, because "[a] trial judge judicially knows what has previously taken place in the case on trial." *Asplundh Tree Expert Co. v. Abshire*, 517 S.W.3d 320, 344 n.13 (Tex. App.—Austin 2017, no pet.), *quoted in In re B.D.A.*, 546 S.W.3d at 364. Further, a trial court has a sua sponte duty to take judicial notice of state agency rules and regulations. TEX. GOV'T CODE §§ 2002.022, 2002.054; *M.C. v. Pantego Camp Thurman, Inc.*, 543 S.W.3d 439, 443 (Tex. App.—Fort Worth 2018, no pet.); *see also* TEX. GOV'T CODE § 2001.003(6), (7) (defining "rule" and "state agency").

11

To prevail in a termination case, the Department must establish that one or more of the acts or omissions enumerated under Texas Family Code section 161.001(b)(1) occurred and that the termination is in the best interest of the children, pursuant to section 161.001(b)(2).

**B.    Legally and Factually Sufficient Evidence Supports the Trial Court's Best-Interest Finding.**

The mother contends that the trial court's best-interest finding relies on conclusory testimony from the Child Advocates volunteer and the Department's caseworker that the mother cannot provide Sheila with a safe and stable home. This testimony, the mother argues, cannot support a firm belief or conviction that termination of her parental rights is in Sheila's best interest.

The Texas Supreme Court has provided a non-exclusive list of factors that may be considered in determining whether the termination of a parent's rights is in a child's best interest. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors include (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or

12

omissions of the parent that may indicate the existing parent-child relationship is not proper, and (9) any excuse for the acts or omissions of the parent. *Id.*

The Department need not prove all the *Holley* factors as a condition precedent to parental termination. *In re C.T.E.*, 95 S.W.3d 462, 466 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (citing *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002)). Undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of the child, but the presence of scant evidence relevant to each *Holley* factor will not support such a finding. *Id.*; *In re J.J.O.*, 131 S.W.3d 618, 630–31 (Tex. App.—Fort Worth 2004, no pet.).

### 1. Evidence supporting the predicate acts for termination factors into the best-interest analysis.

The trial court found endangerment as one of the grounds for termination of the mother's parental rights, and this finding is unchallenged on appeal. Evidence establishing one of the predicate acts under section 161.001(1) may be relevant to determining whether termination is in the child's best interest, particularly when the predicate finding is unchallenged. *See In re C.H.*, 89 S.W.3d at 28.

For purposes of subsection (E), "endanger" means to expose to loss or injury or to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Endangerment means more than "a threat of metaphysical injury or the possible ill effects of a less-than-ideal environment," but "it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *In re T.N.*,

13

180 S.W.3d 370, 383 (Tex. App.—Amarillo 2005, no pet.) (citing *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996)); *see Boyd*, 727 S.W.2d at 533; *see also J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (confirming that endangering conduct is not limited to actions directed toward child).  Conduct occurring either before or after the child's removal from the home may be relevant to determining whether the parent engaged in conduct endangering the child.  *Walker v. Tex. Dep't of Family & Prot. Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

The Department adduced evidence of the mother's long-term substance abuse and extensive criminal history.  Evidence of a parent's substance abuse is relevant to an endangerment finding.  *In re S.M.R.*, 434 S.W.3d 576, 585 (Tex. 2014); *see In re J.O.A.*, 283 S.W.3d at 345 (considering drug abuse and its effect on ability to parent as endangering course of conduct).   A finding under subsection 161.001(1)(E)—that the parent engaged in conduct which endangers the physical or emotional well-being of the child—supports the conclusion that termination is in the child's best interest under the second and third *Holley* factors, those being the emotional and physical needs of the child now and in the future, and the emotional and physical danger to the child now and in the future.  *In re C.H.*, 89 S.W.3d at 28; *see In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013).  Parental substance abuse and past criminal conduct demonstrate poor judgment, which brings into question the parent's ability to provide adequate care for the child.  *See In re M.R.*, 243 S.W.3d

14

807, 821 (Tex. App.—Fort Worth 2007, no pet.). These behaviors also show a greater likelihood that the parent will be impaired or imprisoned, and thus incapable of parenting. *Walker*, 312 S.W.3d at 617; *see Boyd*, 727 S.W.2d at 534; *In re A.M.*, 495 S.W.3d 573, 579 (Tex. App.—Houston [1st Dist.] 2016, pet. denied); *P.W. v. Tex. Dep't of Family & Prot. Servs.*, 403 S.W.3d 471, 479 (Tex. App.—Houston [1st Dist.] 2013, pet. dism'd w.o.j.).

Thus, whether the mother can provide a safe and stable home depends in large part on whether she can remain drug-free. *See In re D.M.*, 452 S.W.3d 462, 472 (Tex. App.—San Antonio 2014, no pet.) (observing that *Holley* factor concerning child's physical and emotional needs weighed in favor of termination where evidence showed that mother's deliberate use of controlled substance endangered child's health and safety in past and, although she had remained sober for over 16 months while under supervision of drug court, mother had three prior relapses after rehabilitation and, as long-term user, would be likely to relapse in future).

The mother admitted to more than 15 years of PCP addiction and to illegal drug use during pregnancy. Admitting that she knew drugs were harmful to a developing child, the mother said that she did not realize she was pregnant for the first few months. After denying that she used drugs after the fifth month of pregnancy, she nevertheless tested positive for PCP while six months' pregnant. This evidence of continued drug use supports a finding that the mother would not be

15

able to meet Sheila's emotional and physical needs and that life with the mother would expose Sheila to emotional and physical danger. *See Cervantes-Peterson v. Tex. Dep't of Family & Prot. Servs.*, 221 S.W.3d 244, 253–54 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (noting that mother's use of narcotics, both before and after child's birth, endangered child's welfare and is relevant to best-interest issue); *see also Latham v. Dep't of Family & Prot. Servs.*, 177 S.W.3d 341, 348 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (considering mother's drug use during pregnancy as evidence of endangerment to unborn child).

The mother's efforts to become drug free have been unsuccessful. Not long after the mother completed a drug rehabilitation program during FBSS, she relapsed into drug use. She frequently tested positive for drugs while this case was pending and failed to appear for testing in the months leading to trial. The mother's court-ordered family service plan cautioned that her failure to appear for testing would be treated as a refusal to submit and would count as a positive test result. Her numerous failures to appear for testing therefore support a reasonable inference that the mother refused to submit to testing because the results would be positive.[3] *See In re J.M.T.*,

---

[3] The mother testified that she did not take some of the drug tests because she was angry and had false information. The trial court was entitled to discount the mother's explanation for her failure to submit to testing and infer from the evidence that she continued to use illegal drugs. *See In re J.L.*, 163 S.W.3d 79, 86–87 (Tex. 2005) (confirming requirement that reviewing court defer to

519 S.W.3d 258, 269 (Tex. App.—Houston [1st Dist.] 2017, pet. denied); *In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.). As an active drug user, the mother's course of conduct demonstrates that she is "not willing and able to provide the child with a safe environment—a primary consideration in determining the child's best interest." *In re A.C.*, 394 S.W.3d at 642; *see also In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("A parent's drug use supports a finding that termination is in the best interest of the child.").

The evidence of family violence and the mother's testimony minimizing the incident that resulted in the father's assault conviction also support a finding that the mother cannot provide a safe and stable home. *See In re A.M.*, 495 S.W.3d at 581 (relying in part on "history of assaultive conduct between the mother and father" in affirming decision that termination of father's rights was in child's best interest).

The second predicate finding, that the mother failed to complete court-ordered services, also supports the finding that termination is in a child's best interest. *See J.M.T.*, 519 S.W.3d at 270 (citing *In re E.C.R.*, 402 S.W.3d at 249). The parent's failure to complete the court-ordered services when her parent-child relationship is

---

factfinder, which is sole arbiter in assessing credibility and demeanor of witnesses).

in jeopardy creates a reasonable inference that the parent is incapable of availing herself of programs that promote the best interest of the child, both now and in the future. *See In re J.M.*, No. 01-14-00826-CV, 2015 WL 1020316, at *7 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (mem. op.).

### 2. Evidence pertinent to other *Holley* factors also supports the trial court's findings.

The caseworker and the Child Advocates volunteer both testified that the foster home provides Sheila with a safe and stable environment. Contrary to the mother's contention, the record contains evidence to support this conclusion. Testimony that the child has bonded with the foster family, is well cared for by them, and has spent minimal time with a parent, is evidence weighing in favor of termination. *See In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *In re J.M.*, 156 S.W.3d 696, 708 (Tex. App.—Dallas 2005, no pet.); *see also In re J.M.T.*, 519 S.W.3d at 270 (placement in safe, stable foster home where child was doing well supported trial court's best-interest finding); *Rogers v. Dep't of Family & Prot. Servs.*, 175 S.W.3d 370, 378 (Tex. App.—Houston [1st Dist.] 2005, pet. dism'd w.o.j.) (successful foster placement and possibility of adoption by foster parents supported determination that termination of parental rights was in children's best interest). The trial court could consider the substantial developmental progress that Sheila made in the eleven months since her placement in the home, starting as a weak, lethargic infant with diagnosed failure to

18

thrive and becoming an active, thriving toddler who meets her developmental milestones.

The trial court also could evaluate the foster parents' ability to provide a safe and stable environment for Sheila based on their qualifications and the extensive training that they successfully completed to become eligible to care for a child like Sheila. *See* TEX. HUM. RES. CODE § 42.0537 (requiring child-placing agency to provide at least 35 hours of competency-based, pre-service training to potential caregiver before child-placing agency may verify or approve caregiver as foster or adoptive home); *id.* § 42.056(a)(5) (requiring foster parent to submit to background and criminal-history checks); *see also* CHILD PROT. SERVS. HANDBOOK § 7000 (describing screening and training requirements). Finally, the trial court heard directly from the foster father about the family's love for Sheila and their desire to adopt her. We defer to the trial court's assessment of the foster father's credibility and demeanor in crediting this testimony as evidence in favor of the trial court's best-interest finding. *See In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014).

Considering the evidence in a light favorable to the trial court's judgment, we conclude that a reasonable factfinder could have formed a firm belief or conviction that termination of the mother's parental rights was in Sheila's best interest; we further conclude that the evidence is factually sufficient to support the judgment. *See J.F.C.*, 96 S.W.3d at 264, 266.

19

# CONCLUSION

We hold that legally and factually sufficient evidence supports the trial court's finding that termination of the mother's parental rights is in the child's best interest. We therefore affirm the judgment of the trial court.

Jane Bland
Justice

Panel consists of Justices Keyes, Bland, and Lloyd.