

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00257-CV

_____

IN THE INTEREST OF J.G., T.G., K.G., AND L.G., MINOR CHILDREN

On Appeal from the 467th District Court
Denton County, Texas
Trial Court No. 19-7974-367

Before Womack, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

Appellant J.G. (Father) appeals the trial court's termination of his parental rights to his four children, J.G., T.G., K.G., and L.G.[1] In nine issues, he challenges the adjudication of his parentage, the trial court's dismissal of his case from the jury docket, and the seven termination grounds found by the trial court. Because we hold that the trial court impliedly adjudicated Father as the children's father and had sufficient evidence to do so; that Father was not harmed by the denial of a jury trial; and that sufficient evidence supports termination, we affirm.

## BACKGROUND

In August 2019, the Texas Department of Family and Protective Services (Department) filed an original petition for the protection of a child, for conservatorship, and for termination in a suit affecting the parent–child relationship with respect to Father's daughters, J.G., T.G., K.G., and L.G. The children were 9, 8, 4, and 3 years old, respectively. In the petition, Father was named as the alleged father. The Department stated that the children had been taken into the Department's care, and it asked to be named temporary sole managing conservator. The Department requested the trial court to determine whether Father was the children's father; it specifically requested that genetic testing be ordered if Father denied parentage but that testing be waived if Father admitted parentage. It requested that

---

[1]We use initials to refer to the children and their family members. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

Father's rights be terminated if (1) the children's reunification with Father could not be achieved or (2) he had not registered with the paternity registry and, after being served, he failed to file an admission of paternity or counterclaim for paternity.

The Department attached to its petition an affidavit from the Department's caseworker who had investigated the case initially. The investigator stated that in July 2019, the Department received a report of physical neglect and neglectful supervision involving the children. The report "expressed concerns about four children living in a hotel room in Denton where various men were going in and out of the hotel room and there w[ere] concerns about drugs and prostitution." The children's mother (Mother) initially avoided the investigator's attempts to meet with her and the children, but the investigator was eventually able to locate her and the children at a community soup kitchen. The investigator noted that although the children appeared slightly disheveled, they seemed healthy and well-fed. Mother agreed to a drug test; her test was positive for cocaine, and, according to other documents later filed with the trial court, all four children also tested positive for cocaine. The trial court signed an order for protection naming the Department as temporary sole managing conservator and appointed a CASA advocate for the children.

The Department's October 2019 status report to the court stated that the Department's primary goal was family reunification. A February 13, 2020 permanency report to the court noted that Father had been served only recently, in January. It further stated that the Department had done a home study on Father's mother, which

3

ruled her out as a possible placement. The report noted that Father had been assigned a courtesy caseworker and, although he had not started on his services—and a CASA report stated that he had not yet received a service plan—he had begun attending visits with the children in December 2019. According to the CASA report, Father reported living with various family members in Wichita Falls.

On February 19, 2020, the trial court held an initial permanency hearing, and each parent appeared in person with their respective court-appointed attorney. The trial court then signed its initial permanency order, which stated that Father had not demonstrated adequate and appropriate compliance with his service plan but was working on establishing services. The court incorporated and adopted the parents' service plans as a court order and admonished the parents of the importance of following the plan. Father signed the order.

An April 2020 permanency report to the court reiterated that the primary permanency goal was family reunification. By this time, a different caseworker had been assigned to work on the case. The caseworker's report noted that Mother had not completed most of her services and had refused requested drug testing in October, November, and December 2019, and that she had been arrested in March and was currently in the Denton County jail. The report stated that Father had been court ordered to participate in a drug and alcohol assessment, random drug testing, parenting classes, and weekly child visitations. He had had negative drug test results in December and March, and his April results were pending. He had not yet started his

4

parenting classes and was alternating between living with his mother and with his girlfriend. He had been ordered to maintain employment but was currently unemployed.

In May 2020, the Department filed a "Child's Plan of Service" for each child and a family service plan[2] for each parent. The children's service plans noted that Father had weekly visits and that as of that point, Father had attended all scheduled visits and was actively involved in the case. Father's family plan evaluation noted that he had tested positive for cocaine, still did not have a stable living environment, and did not have a stable job. The plan stated that Father needed to complete a drug and alcohol assessment and was required to attend AA or NA meetings weekly until his drug and alcohol assessment was completed, that he needed to submit to random drug testing, and that his failure to comply with testing would be viewed as a positive result. It further noted that Father had stated that he had used marijuana since he was 20 years old, that the last time he was sober was two years prior when he was still with Mother and their children, and that he smoked marijuana only when he was bored or with friends. A CASA report filed around the same time noted that Father was the children's biological father, had tested positive for cocaine in April, worked part-time as a mover, and was regularly attending visitations.

---

[2]The document was entitled "Family Plan Evaluation," but at trial the Department identified it as the service plan, and it contained the required contents of a service plan. *See* Tex. Fam. Code Ann. § 263.102.

5

In May 2020, the trial court signed a permanency hearing order that incorporated Father's service plan and made it an order of the court. The court also signed a temporary order following an adversary hearing. That order required Father to comply with the Departments service plans, have suitable employment for at least six months during the suit's pendency, establish appropriate housing, attend AA or NA meetings five times a week, complete drug and alcohol assessment and testing as directed by the Department, attend counseling sessions, complete a psychosocial evaluation, complete a parenting class, have weekly supervised visits, and pay monthly child support of $100. Up to that point, Father had been participating in the case and his services. However, after May 2020, Department and CASA reports indicated that Father had all but ceased participating or communicating with the Department, and the trial court's orders all indicated that Father was not making sufficient progress with his services.

In the Department's August 2020 permanency report, in which the permanency goal for the children had been updated to unrelated adoption or relative conservatorship rather than family reunification, the Department noted that Father had not performed his services and that he had not visited the children since May; "He was confirming his visits with the children and then cancelling at the last minute or not showing up."

The trial court held another permanency hearing on September 2, 2020. Father did not attend the hearing, but his attorney did. The court then signed a permanency

6

hearing order stating that Father had not demonstrated adequate and appropriate compliance with the service plan and that Father needed to comply with his visitation plan.

In December 2020, the Department filed another permanency report with the court, noting again that Father had not worked his services or showed for his visitations and that he had not been in contact with the Department. A CASA advocate report also noted that Father had not attended visitation since May 11, 2020, and that since that time he had stopped contacting CPS and had not asked to see his daughters. The trial court's permanency hearing order again found that Father had not demonstrated adequate compliance with his service plan.

In January 2021, the case was transferred from the 367th District Court to the 467th District Court. In March 2021, the Department filed a permanency report stating that Father had not been in contact with the Department and had not worked his services. An April 2021 CASA advocate report stated that Father had attended a virtual visit in January 2021 but had not shown up for scheduled visits in March and April. That same month, the trial court held a permanency hearing, which Father's attorney attended but, again, Father did not. The trial court's permanency hearing order found that Father had not demonstrated adequate compliance with his service plan.

In July 2021, Mother and the Department signed a mediated settlement agreement in which Mother agreed to sign an affidavit of voluntary relinquishment for

her children. In the same month, the trial court signed another permanency hearing order, again finding that Father had not demonstrated compliance with the service plan.[3]

The trial court tried the case in August 2021. Father's attorney appeared, but he did not. Although Father had not made a jury trial demand, Mother had done so prior to executing her relinquishment affidavit. On the day of the trial, over Father's objection, the trial court granted the Department's motion to remove the case from the jury docket and found that Father had waived his jury demand by not appearing and participating in the proceeding.

The Department presented testimony from the Department's caseworker, the initial investigating caseworker, and the CASA advocate. Father did not present any witnesses or introduce any other evidence. At the conclusion of trial, the trial court terminated Father's parental rights. The trial court then signed a final order of termination in which the trial court found by clear and convincing evidence that the parent–child relationship between Father and the children should be terminated, that Father had committed the grounds in Texas Family Code Section 161.001(b)(1)(A), (B), (D), (E), (F), (N), and (O), and that termination was in each child's best interest.

---

[3]In the section of the order indicating whether Father appeared for the hearing, the trial court checked a box stating that Father "agreed to the terms of this order as evidenced by signature below." However, Father did not personally sign the order, and his attorney signed the order as to form only.

8

The Department was appointed as permanent managing conservator. Father now appeals.

## STANDARD OF REVIEW

For a trial court to terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence: 1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and 2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.*

In evaluating the evidence's factual sufficiency to support termination, we must perform "an exacting review of the entire record." *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved the termination grounds. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

## DISCUSSION

### I. Evidence Supports Parentage Adjudication

Father did not contest his parental status in the trial court, but in his first issue on appeal, Father argues that he has not been established as the children's parent because he did not sign a paternity acknowledgement, was never married to Mother and was thus not a presumed father, had not been previously adjudicated as their father, and did not adopt the children, and that the evidence was insufficient to adjudicate him as the father in this proceeding. We disagree; the trial court impliedly adjudicated Father as the children's father, and the evidence supports that adjudication.

Although the termination order did not expressly address the issue, the order impliedly adjudicated Father as the children's father because it referred to him as the

10

"Respondent Father" and terminated his parental rights under Texas Family Code Section 161.001, and termination under that section requires the existence of a parent–child relationship. *See In re M.H. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-19-00525-CV, 2020 WL 89139, at *3 (Tex. App.—Austin Jan. 8, 2020, no pet.) (mem. op.). Father asserts that there was no parentage adjudication because the trial court's permanency orders before trial referred to Father as the "Respondent Alleged Father."[4] Father refers to the orders' identification of the parties and their attorneys. Notwithstanding that language in the pretrial orders, at trial the trial court nevertheless could and, as shown in the termination judgment, impliedly did adjudicate Father as the children's father.

As for the evidence to support the adjudication, "[i]n suits to terminate parental rights, paternity may be shown by evidence admitted at trial, judicial admissions, and pleadings and other documents in the court's file of which the court may take judicial notice." *Id.* (citing cases). As in *M.H.*, the record here indicates that throughout the proceedings below, Father "did not deny paternity and instead acted in a manner that was consistent with him being the father of the child[ren]." *Id.* In *M.H.*, the court of appeals concluded that the following behavior by the father was behavior consistent with his being the father:

> The Department's original petition for protection of the child requested that if the father appeared at the initial show-cause hearing and denied paternity, then the district court should order genetic testing. The record

---

[4]Various other orders in the record refer to Father as "Respondent Father."

reflects that the father appeared in person at the initial show-cause hearing and announced ready. No genetic testing was ordered following the hearing, which supports a finding that the father did not deny paternity at that time. The father also appeared in person at subsequent hearings and announced ready. Nothing in the temporary orders following those hearings indicates that the father denied paternity at those hearings. Moreover, following the initial permanency hearing, the father filed an affidavit of indigence and requested court-appointed counsel, which supports a finding that the father wanted to contest the termination of his parental rights.

*Id.* Similarly, here, the Department's petition sought genetic testing and termination if Father denied paternity. Father appeared at the initial permanency hearing, and although we have no record of that hearing,[5] no genetic testing was ordered following that hearing, and the trial court did not terminate Father's rights based on a denial of paternity.[6] Father's attorney appeared at the permanency hearings, and nothing in the orders following those hearings indicated that Father's attorney had denied Father's paternity at the hearings. Father filed no subsequent pleadings or motions contesting paternity, and Father filed an affidavit of indigency to obtain an attorney to contest termination. Also similar to *M.H.*, Father's attorney identified himself at trial as

---

[5]The record also contains no answer filed by Father or any other pleading or motion denying the Department's allegations.

[6]Father argues under this issue that we must reverse the trial court's judgment and render judgment for him denying termination because "[w]ithout [Father's] being a parent, his 'parental rights' cannot be terminated, for he has none." However, an alleged father's parental rights may be terminated if, "after being served with citation, he does not respond by timely filing an admission of paternity or a counterclaim for paternity. . . ." Tex. Fam. Code Ann. § 161.002(b). Accordingly, a failure to acknowledge paternity does not prevent a father's parental rights to a child from being terminated, and the Department pled for the trial court to terminate Father's rights if he denied paternity.

attorney for "Respondent Father," and he objected to the waiver of a jury trial and contested the termination throughout the trial. Further, prior to trial, Father filed a motion for continuance and extension of dismissal date referring to himself as the "Respondent Father" rather than as the alleged father and asserting that he was working his services.

Additionally, the children had Father's last name, and at trial the caseworker testified that Mother provided Father's name as the children's biological father, that she never alleged anyone else to be the children's father, and that Father never denied paternity to her. The investigator also testified that Mother provided Father's name as the children's biological father; although Father asserts that the investigator said that Mother never identified anyone as the children's father, the testimony to which he cites is the investigator's testimony that *initially* Mother refused to provide a name. Further, Father initially attended all of his visitation appointments and participated in his services by agreeing to a drug test and attending a parenting class, indicating that, at first, Father wanted to be reunited with his children because he was, in fact, their father. *See id.* We hold that the evidence is legally and factually sufficient to support the trial court's adjudication of paternity. We overrule Father's first issue.

## II. Harmless Jury Trial Denial

In Father's second issue, he argues that he was wrongfully denied a jury trial. We assume for purposes of the appeal that Father was entitled to have the case remain on the jury docket. Like most judicial errors, the wrongful denial of a jury trial

13

is subject to harmless error review. *See* Tex. R. App. P. 33.1; *Halsell v. Dehoyos*, 810 S.W.2d 371, 372 (Tex. 1991). Father makes no harm arguments in his brief, but "[a] refusal to grant a jury trial is harmless error only if the record shows that no material issues of fact exist and an instructed verdict would have been justified." *Halsell*, 810 S.W.2d at 372. Accordingly, we look to see if the record reveals material fact issues that would prevent an instructed verdict[7] on any of the termination grounds.[8]

---

[7]There appears to be a split among courts of appeals of how to apply this standard. For example, the San Antonio Court of Appeals held that harmful error existed in a termination case, not necessarily because of the record, but because in a termination case, the Department must prove a statutory termination ground and best interest, and, thus "numerous material fact issues exist in a parental termination case. . . ." *In re L.J.G.*, No. 04-17-00526-CV, 2018 WL 340129, at *5 (Tex. App.—San Antonio Jan. 10, 2018, no pet.) (mem. op.). The Tyler Court of Appeals, on the other hand, has analyzed the record to determine if any conflicting evidence actually existed to create a fact issue on the termination grounds. *In re J.M.*, No. 12-19-00353-CV, 2020 WL 1528054, at *11 (Tex. App.—Tyler Mar. 31, 2020, no pet.) (mem. op.); *see also In re K.S.*, No. 06-21-00062-CV, 2021 WL 4848750, at *4 (Tex. App.—Texarkana Oct. 19, 2021, no pet.) (mem. op.) (holding jury trial denial was harmful in termination case because of conflicting evidence regarding best interest); *In re Jetall Cos., Inc.*, No. 14-20-00690-CV, 2021 WL 1420950, at *5 (Tex. App.—Houston [14th Dist.] Apr. 15, 2021, orig. proceeding) (holding jury trial denial harmful when trial court had determined fact issue existed); *L. C. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-20-00481-CV, 2021 WL 1148959, at *6 (Tex. App.—Austin Mar. 26, 2021, pet. denied) (mem. op.) (holding denial harmful where the record demonstrated material fact issues regarding best interest and termination grounds). This court has previously applied the same approach as the Tyler court and considered whether the record contained conflicting evidence. *See In re P.L.G.M.*, No. 02-13-00181-CV, 2013 WL 5967037, at *5 (Tex. App.—Fort Worth Nov. 7, 2013, no pet.) (per curiam) (mem. op.). We therefore follow that approach here.

[8]Father does not challenge the trial court's best-interest finding, and we therefore do not consider the evidence as to that finding.

As we discuss below, the Department's evidence was sufficient to establish termination under ground (E). None of its evidence raised a fact issue on that ground, and Father presented no evidence at all. Father was therefore not harmed by the jury trial denial, and we overrule Father's second issue. However, we note that "the record and facts in this case present a rare situation where harm has not been shown and the holding in this case should be limited as such." *J.M.*, 2020 WL 1528054, at *11.

### III.  Sufficient Termination Ground Evidence

In his remaining issues—issues three through nine—Father challenges the legal and factual sufficiency of the evidence on each termination ground. Because Father produced no evidence of his own, we review only the evidence presented during the Department's case to determine sufficiency.

### A.  The Department's Evidence

At trial, the court admitted into evidence the May 13, 2020 temporary order in which Father was ordered to submit to a psychosocial evaluation and to follow any recommendations made from the assessment; to participate in counseling; to complete a parenting class; to participate in a drug and alcohol assessment and submit to drug testing as directed by the Department; to attend AA or NA meetings and provide proof of his attendance to his caseworker; to inform the court if he used any illegal substances during the suit's pendency; to establish safe, stable, and appropriate housing and suitable employment; and to comply with his service plan.

15

The trial court also admitted the Department's "Family Plan Evaluation" from July 2020, which included the service plan and the Department's notes about Father's performance. That document stated that Father had tested positive for cocaine and admitted to regular marijuana use and that the last time he was sober was over two years prior; that Father needed to attend AA or NA meetings, participate in a drug and alcohol assessment, and submit to random drug tests; and that failure to comply with his drug tests would be viewed as a positive drug test. The plan further stated that Father did not have a stable living environment and alternated between living with his mother and his girlfriend; that Father had not had a stable job for a year; that Father had made little effort to contact his daughters after he and Mother broke up; and that he needed to be more active in the case.

Caseworker Denise Dull testified about Father's compliance with his service plan. Father had attended one parenting class and had taken one drug test in May 2020, which was positive for marijuana and cocaine. He had not submitted to drug testing since that time, and he admitted to another caseworker that he still smokes marijuana. Further, Father had not completed his drug and alcohol assessment or, to her knowledge, participated in AA or NA. He had not paid any child or medical support. He had not participated in a psychosocial evaluation or in individual counseling. Since May 2020, he had participated in only one five-minute visit with his children. The caseworker stated that between the children and Father, "there is no relationship. They don't know who he is. He is not an active participant in the case."

16

She further testified, "There's still alleged drug use by him, and he doesn't have the financial means that I have seen to be able to take care of these children or a stable home environment for them."

As for providing employment documentation, Father had finally provided the caseworker with two paystubs in January 2021 but had given her nothing since that time. He had not provided any documentation, such as a lease contract, to show that he had stable housing.

The Department's investigator testified and admitted that she never met Father. Her testimony focused mostly on the children's environment with Mother. She also acknowledged that when she met the children, they looked "healthy, cared for, [and] fed." But she also said that based on Mother's drug test results and her refusal to do future tests, she had concerns about the children's safety, and she believed that the environment in which the children lived with Mother had led them to have exposure to illegal substances. She also testified that Mother acted belligerent and aggressively toward the investigator and that throughout her investigation, she noticed that the children were exposed to Mother's "dramatic mood swings." She believed that the environment with Mother was not safe.

On cross-examination, the investigator acknowledged that Mother appeared to be attempting to keep the children from Father. However, she further testified that Mother had told her that Father was not safe. She was not aware of any attempts made by Father to "come and secure his children from the Department." Father

17

introduced no evidence that before the children were taken into care, he had made any effort to locate them or spend time with them.

The CASA advocate testified as well. Asked about his contact with Father, he replied, "It's been sporadic, but there were several times over the course of the case. Now it's almost two years." He said that Father had failed to show up for "many" visits with the children, missing more visits than he made. The advocate had been in contact with Father's service providers, and other than the parenting class provider, none of the providers had notified him that Father had completed his services. To the advocate's knowledge, Father had not paid medical or child support or sent any gifts to the children. Except for one time in the previous year, Father had not reached out to him to ask how the children were doing, even though Father had his phone number and email address.

Additionally, we presume that the trial court took judicial notice of its own records, "including its orders and incorporated findings," and our scope of review under both our legal and factual sufficiency analysis is the entirety of the record evidence. *In re M.W.*, No. 02-21-00146-CV, 2021 WL 3679247, at *4 (Tex. App.—Fort Worth Aug. 19, 2021, pet. denied) (mem. op.). The trial court's previous preliminary hearing orders found that Father had not been adequately performing his services.

## B. Endangerment under Subsection (E)

The trial court granted the termination in part on the grounds listed in Subsections (D) and (E) of Section 161.001(b)(1). If a trial court's termination is based on (D) or (E), an appellate court must review those grounds when raised on appeal—even if other grounds would support termination—because a termination on either of those grounds has collateral consequences for the parent's relationship with other children the parent may have in the future. *In re R.H.*, No. 02-20-00396-CV, 2021 WL 2006038, at *13 (Tex. App.—Fort Worth May 20, 2021, no pet.) (mem. op.). Accordingly, we begin with those grounds.

Father's sixth issue challenges the (E) ground. That ground permits termination when the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child," when termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b)(1)(E). "Endanger" in this context means "to expose to loss or injury, to jeopardize." *In re M.B.*, No. 02-15-00128-CV, 2015 WL 4380868, at *12 (Tex. App.—Fort Worth July 16, 2015, no pet.) (mem. op.) (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) and *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)).

The relevant inquiry under (E) is "whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act." *M.B.*, 2015 WL 4380868, at *12.

19

Termination under Subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *J.T.G.*, 121 S.W.3d at 125. However, the parent's conduct need not be directed at the child or actually cause the child injury; "[t]he specific danger to the child's well-being may be inferred from parental misconduct standing alone." *M.B.*, 2015 WL 4380868, at *12. Courts may consider a parent's conduct that occurred outside the child's presence or after the child's removal by the Department.[9] *In re M.S.*, No. 02-20-00147-CV, 2020 WL 6066400, at *4 (Tex. App.—Fort Worth Oct. 15, 2020, no pet.) (mem. op.); *In re R.S.*, No. 02-15-00137-CV, 2015 WL 5770530, at *6 (Tex. App.—Fort Worth Oct. 1, 2015, no pet.) (mem. op.). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *M.B.*, 2015 WL 4380868, at *12.

A trial court may consider a parent's failure to complete a service plan as part of its endangering-conduct analysis. *Id.* (citing *In re R.F.*, 115 S.W.3d 804, 811 (Tex. App.—Dallas 2003, no pet.)). Further, "illegal drug use after a child's removal or during the pendency of a termination proceeding is conduct that jeopardizes parental

---

[9]To the extent that Father complains about the lack of evidence regarding endangerment by him before the children were taken into the Department's care, we note that "the record is sparse with respect to Father [during that time] because his complete lack of contact with the children and lack of involvement with their lives leaves little to record." *See In re B.D.A.*, 546 S.W.3d 346, 363 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). Lack of contact with a child can constitute endangerment. *V.P. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797, at *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.).

rights and may be considered as establishing an endangering course of conduct under subsection (E)." *In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied). Although an endangerment finding based on drug use alone is not automatic, *id.*, "[a] parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, supports a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being." *In re J.A.G.*, No. 02-10-00002-CV, 2010 WL 4539442, at *1 (Tex. App.—Fort Worth Nov. 10, 2010, no pet.) (mem. op.) (quoting *In re J.W.*, No. 02-08-00211-CV, 2009 WL 806865, at *4 (Tex. App.—Fort Worth Mar. 26, 2009, no pet.) (mem. op.)). Further, a trial court may consider in its analysis a parent's failure to visit, which can endanger the child's emotional well-being. *In re M.K.*, No. 02-19-00459-CV, 2020 WL 1949629, at *6 (Tex. App.—Fort Worth Apr. 23, 2020, no pet.) (mem. op.); *M.B.*, 2015 WL 4380868, at *12.

Father tested positive for illegal drugs in his April 2020 drug test, and he declined to take another test despite being ordered to do so. As noted above, his failure to test authorized the trial court to presume that if he had tested, the results would have been positive. *See J.W.*, 2009 WL 806865, at *4. Father failed to complete most of the services in his service plan, and between May 2020 and the August 16, 2021 trial, he made almost no effort to attend visitations or check on his children's well-being. The evidence was thus legally and factually sufficient to support an endangerment finding under Section 161.001(b)(1)(E). *See M.K.*, 2020 WL 1949629, at

21

*6; *In re D.C.*, No. 05-19-01217-CV, 2020 WL 1042692, at *10 (Tex. App.—Dallas Mar. 4, 2020, pet. denied) (upholding endangerment finding when mother admitted she used drugs multiple times during the termination case's pendency and refused to submit to monthly drug tests); *M.B.*, 2015 WL 4380868, at *12.

Because we consider Father's failure to complete his services as part of our ground (E) analysis, we address here Father's arguments under his ninth issue challenging the termination on the (O) ground, which allows termination when a parent failed to perform the court-ordered actions that were "necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services. . . ." *See* Tex. Fam. Code Ann. § 161.001(b)(1)(O).

Father does not dispute that he received the service plan, and Father did not testify or put on any evidence explaining his failure to perform his services. *See id.* § 161.001(d). However, Father contends that the evidence is insufficient to show that he failed to perform almost all of his services because the Department presented no testimony from service provider representatives about Father's efforts toward completing his services and produced no records from service providers. Father asserts that the caseworker testified that she "can't say" whether Father completed his services and that her testimony that "to [her] knowledge" certain services had not been completed was too weak to justify termination. Father's arguments are unpersuasive.

22

The Department had to present competent evidence that Father did not perform his services in order to establish ground (O) or to rely on his failure to complete services as part of the endangerment ground. *See id.* § 161.001(b)(1)(O). However, Father cites no authority for the proposition that to do so, the Department was required to produce testimony or other evidence directly from the service providers. Here, the CASA advocate testified that he had been in communication with Father's service providers and that Father had not completed his services, and, as we discuss next, the caseworker testified about matters within her knowledge regarding Father's participation in his services.

A witness may only testify to matters of which the witness has personal knowledge, *see* Tex. R. Evid. 602, and the context of the caseworker's testimony demonstrated that it was based on matters that were within her knowledge as the caseworker. For example, the trial court had ordered that Father's weekly visitations with his children be supervised by the Department. The caseworker testified that since May of the previous year, Father had attended only one Department-supervised visit with the children. The caseworker's testimony was supported by the CASA advocate's testimony, who stated that Father participated in a virtual visit in January of the current year and had failed to show up for his other visits.

The caseworker further testified that Father had failed to submit to drug testing. The trial court's previous order provided that the results of those tests "will be reported to the Department," and thus Father's failure to test would be within the

23

caseworker's knowledge because the Department would have received his test results had there been any. Father presented no evidence that he had participated in drug testing and that the results had somehow not been communicated to the Department. Also, some of Father's services required him to provide the information to the Department himself; for example, the trial court's order required Father to provide the caseworker with proof that he had attended NA or AA. Accordingly, the caseworker's testimony that he had never done so was within her personal knowledge. Further, we presume that the trial court took judicial notice of its prior permanency hearing orders in which it found that Father had not demonstrated adequate compliance with his services.

As for the caseworker's testimony that she "can't say" about Father's services compliance, that statement was specifically in response to a question of whether she believed that after Father's parenting class—the only service he completed—he had "demonstrated that he learned anything regarding parenting from that class." The caseworker answered that she could not say because she had not been able to observe Father as a parent, and she then testified about his failure to show up for his visits.

Based on the testimony of the caseworkers and the CASA advocate, the Department's trial exhibits, and the trial court's knowledge of its previous orders, the evidence is legally and factually sufficient to show that Father failed to comply with the services ordered by the trial court. Accordingly, the trial court could consider

24

Father's failure to perform his services as evidence supporting the endangerment finding under (E). We overrule Father's sixth issue.

Because we have affirmed the sufficiency of the evidence to support the (E) ground, we need not address the (D) ground. *See In re E.C.*, No. 02-20-00022-CV, 2020 WL 2071755, at *5 (Tex. App.—Fort Worth Apr. 30, 2020, no pet.) (mem. op.). We therefore do not address Father's fifth issue.

## CONCLUSION

Having overruled Father's first, second, and sixth issues, which are dispositive, we affirm the trial court's judgment.

/s/ Mike Wallach
Mike Wallach
Justice

Delivered: January 20, 2022

25