**Opinion issued April 27, 2023**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-22-00094-CV**

———————————

## IN THE INTEREST OF I.M.S AND C.K.S., CHILDREN

---

**On Appeal from the 257th District Court**
**Harris County, Texas**
**Trial Court Case No. 2020-49033**

---

## MAJORITY OPINION

Appellee A.L. ("Mother") and her husband A.L. ("Stepfather") filed this private suit to terminate the parental rights of appellant B.S. ("Father") to his two minor daughters. Mother and Stepfather also requested that Stepfather be allowed to adopt the children. The trial court found that Father had violated two statutory predicate grounds for termination and that termination of his parental rights was in

the best interests of the children. *See* TEX. FAM. CODE § 161.001(b)(1)(F), (Q), (b)(2).

On appeal, Father, who is pro se and incarcerated, argues that (1) the trial court's failure to appoint counsel to him violated his due process rights, and (2) the trial court erred by terminating his parental rights to the children. We reverse and remand.

## Background

Mother and Father were married and they had two children together: I.M.S. ("Iris"), who was born in 2009, and C.K.S. ("Catherine"), who was born in 2011.[1] Iris and Catherine were twelve and ten years old, respectively, at the time of trial in this case.

In May 2013, the trial court signed a final decree of divorce. The decree named the parties joint managing conservators of the children, and Mother was given the exclusive right to designate their primary residence. The decree limited this right to designating the children's primary residence within 300 miles of Father's residence, so long as he resided in Arlington, where he lived at the time of the divorce proceedings. At the time, Mother lived in Huffman, Texas, and worked in Houston. With respect to Father's possessory rights, the decree gave Father a modified

---

[1] In this opinion, we use pseudonyms for the parties and their minor children to protect their privacy.

2

standard possession order. The decree also ordered Father to pay Mother $450 per month in child support.

In the years following the divorce, Father regularly exercised his possessory rights under the decree. However, it became obvious to Mother in 2016 that Father had started using drugs, including marijuana and methamphetamine, and that he did so during his times of possession. Mother testified that the children "were put in dangerous situations more than once," and that Father left them unsupervised at home and in public places, including pools and restaurants. Mother stated, "They were around drugs, all different kinds." The last time Father saw the children in person or talked to them was June 2016.

As a result of Father's drug use, Mother moved to modify the parent-child relationship. The trial court signed a modification order in March 2017. The modification order named Mother as sole managing conservator and Father as possessory conservator. The court found that awarding Father access to the children would not be in their best interest. The court therefore ordered that Father's visitation with the children was to be supervised through the Guardians of Hope program in Houston. The order required Father to register with the program within ten days, and it also required both Father and Mother to comply with the program's rules and regulations. The order specified that if Father did not register with Guardians of Hope, Mother was not required to register. If this occurred, Father's possession

would be supervised by the Harris County Victims Assistance Center. The court ordered Father to pay 100% of the cost of the supervised visitation program.

According to Mother, Father made a payment to Guardians of Hope, but he did not provide his driver's license or proof of insurance, both of which the program required, and therefore Father did not complete the registration process. Mother registered with the program but was not required to pay anything until Father completed the registration process, which he never did. Guardians of Hope contacted Mother about Father's visitation with the children to inform her that "it wasn't going to happen."

In August 2020, Mother filed the underlying petition to terminate Father's parental rights and to allow Stepfather to adopt the children. As grounds for termination, Mother alleged that Father:

(a) voluntarily left the children alone or in the possession of another without providing adequate support of the children and remained away for a period of at least six months;

(b) failed to support the children in accordance with his ability during a period of one year ending within six months of the date of the filing of this petition; and

(c) knowingly engaged in criminal conduct that has resulted in his conviction of an offense and confinement or imprisonment and inability to care for the children for not less than two years from the date this petition is filed.

*See id.* § 161.001(b)(1)(C), (F), (Q). Mother also alleged that terminating Father's parental rights would be in the children's best interests. The trial court appointed an amicus attorney to represent the interests of the children.

Father filed a pro se answer and an unsworn declaration of inability to pay costs. In this filing, Father declared that he was presently incarcerated. Father also alleged that due to his indigency, he was unable to hire an attorney to represent him. He requested that the trial court appoint an attorney ad litem to represent his interests. The trial court did not appoint an attorney to represent Father.[2]

In December 2021, the trial court held a bench trial. Mother testified that Father did not comply with his child support obligation. The trial court admitted a printout from the Attorney General's Child Support Division that was dated the month before trial and reflected Father's payment history. This document showed that Father made sporadic payments throughout 2013, 2014, and 2015. According to this report, Father made a $650 payment in January 2016, an $11,413.35 payment in January 2018, and a $1,455.48 payment in August 2021. He made no other payments after January 2016, and he had over $27,000 in arrearages. When shown this document, Mother agreed that she received payments in January 2016 and August

---

[2] At trial, the trial court asked whether Father had requested representation. Mother's attorney responded that Father had requested counsel, but "because this is a private termination and not being done through the State, he is not entitled to one." The court ordered the trial proceedings to continue.

2021, but she disagreed that she received an $11,000 payment in January 2018. She testified that she never received a payment of that size, and Father did not pay any child support in 2018.

Mother also testified that, at the time of trial, Father was incarcerated after being convicted of possession of marijuana, robbery, and kidnapping. When asked what the "underlying event" was for these convictions, Mother stated, "He robbed his grandparents at gunpoint and beat them up." The trial court admitted copies of five judgments of conviction. These judgments reflected that, in February 2020, Father pleaded guilty to the third-degree felony offense of possession of between five and fifty pounds of marijuana, two counts of the first-degree felony offense of aggravated robbery with a deadly weapon, and two counts of the first-degree felony offense of aggravated kidnapping. Father's punishment for each offense was set at nine years' confinement, to run concurrently. At the time of judgment, Father had credit for nearly two years of time already served.

Mother married Stepfather in October 2016. Stepfather had known the children for nearly their entire lives. Mother testified that Stepfather had a good relationship with the children and that he was a "wonderful dad." She stated: "[Stepfather is] their dad in their eyes. He has been for many years. And he raises them and takes good care of them and they love him very much." Mother believed that terminating Father's parental rights—and allowing Stepfather to adopt the

6

children—would be in the children's best interest. She also agreed with the children's amicus attorney that there was no way to keep the children safe other than to terminate Father's parental rights.

Upon questioning from Father, Mother testified that providing letters and artwork to the children was not the same as providing child support payments, and Father had not provided support and care while he was incarcerated. Mother agreed that, around 2017, she blocked Father from communicating with the children by phone, but she did not prohibit Father from speaking with the children through email. She stated that if Father had sent her an email, "which [he] was not blocked from, and asked to talk to the girls and remain not irate, [he] would have been able to talk to the girls." Mother testified that she prohibited Father from speaking with the children by phone because, over the course of several months, Father made "repeated phone calls, harassment, threats, derogatory speech, middle of the night calls, all day calls, all-day text messages." Because Father refused to stop this behavior, she refused to allow Father to speak with the children by phone.

Stepfather testified that he "provide[s] a place for the girls to live" and "provide[s] everything that they have." He tries "to be a father figure to them," and he views the children as if they were his own biological children. He testified that he and Mother have two younger children together. Stepfather agreed that, regardless of the outcome of the trial, he would continue acting as a father figure to

the children. He also agreed that terminating Father's parental rights was in the children's best interest.

Father testified and acknowledged that he had pleaded guilty to five offenses, that he was serving a nine-year sentence for the offenses, and the complainants in the robbery and kidnapping charges were his grandparents. He admitted that a firearm was involved in those offenses, but he stated that it was his grandparents' gun that he took away from his grandfather. He also stated that these offenses occurred in June 2018. Father did not know how much marijuana he had in his possession at the time of that offense, but it was at least five pounds. He denied that he intended to sell the marijuana, stating instead that he had purchased it "for personal use."

When asked about his payment of child support, Father testified that he did not have the means to pay child support from 2016 onwards. Father had been self-employed and owned a business printing T-shirts. Some months, he would earn more than the amount of his child support obligation, but he "was trying to take care of [himself]" and did not use these earnings to pay child support. He stated that he had not had the means to pay child support since his incarceration in June 2018.[3] When

---

[3] Father informed the trial court that his house was foreclosed upon after he was arrested, and approximately $26,000 of excess proceeds will go to Mother to satisfy Father's child support obligation. Mother's counsel confirmed that he had submitted to the court an application for a writ of garnishment to access these funds, but the court had not yet ruled upon that request. Statements by both Father and Mother's

8

asked by the children's amicus attorney who he expected to provide for the children when he was not paying child support and when he was incarcerated, he stated, "Their mother."

Father agreed that he had not seen the children since 2016, but he stated that this was not due to lack of effort and that he had "tried very hard to see [his] kids." When asked about the March 2017 modification order's requirement that he register for supervised visitation with Guardians of Hope, Father testified that he completed the registration, provided appropriate identification, and paid the required fees.[4] According to Father, supervised visitations never occurred due to Mother's failure to register with the program. Father never filed anything with the court to enforce his visitation rights.

With respect to his incarceration, Father testified that he would be eligible for parole in December 2022. If he is not granted parole at that time, he could continue to seek parole each year after that. If he is never granted parole, he would be released from confinement in 2027. In addition to the charges for which he was currently confined, he also had "some misdemeanors," but he did not remember what those

---

counsel suggest that the foreclosure sale of Father's house occurred in 2018, after Father's arrest, but no one stated precisely when the sale occurred or when Father became entitled to any excess proceeds from the sale.

[4] Father stated that he had a receipt from Guardians of Hope demonstrating his registration with the program. Father did not offer a receipt as documentary evidence.

charges were. He did not dispute Mother's testimony that he was placed on supervised visitation with the children in 2017 because he had tested positive for marijuana and methamphetamine usage. He stated, however, that he had not "had a problem with drugs."

The trial court signed an order terminating Father's parental rights. The court found, by clear and convincing evidence, that Father had (1) failed to support the children in accordance with his ability during a one-year period ending within six months of the date of filing of the petition; and (2) knowingly engaged in criminal conduct that resulted in his conviction of an offense and confinement and inability to care for the children for not less than two years from the date the petition was filed. *See id.* § 161.001(b)(1)(F), (Q). The court also found, by clear and convincing evidence, that terminating Father's parental rights would be in the children's best interest.

This appeal followed.

## Denial of Appointed Counsel

In his first issue,[5] Father, who has been pro se and incarcerated throughout the pendency of this proceeding, argues that the trial court's failure to appoint him counsel violated his due process rights.

---

[5] Father filed his appellate brief before the court reporter filed the reporter's record, and therefore Father's brief does not contain any citations to the appellate record. *See* TEX. R. APP. P. 38.1(i) (requiring appellant's brief to contain "a clear and

## A.    *Governing Law*

Suits to terminate a parent's parental rights can be filed by multiple parties, including a governmental entity—such as the Department of Family and Protective Services—and the child's other parent. *See* TEX. FAM. CODE § 102.003(a)(1), (5), (6); *In re H.D.D.B.*, No. 01-20-00723-CV, 2022 WL 2251655, at *8 (Tex. App.— Houston [1st Dist.] June 23, 2022, no pet.) (mem. op.). In a termination suit initiated by a governmental entity, an indigent parent has a statutory right to appointment of an attorney ad litem to represent his interests. *See* TEX. FAM. CODE § 107.013(a)(1); *In re B.C.*, 592 S.W.3d 133, 134 (Tex. 2019) (per curiam); *In re J.C.*, 250 S.W.3d 486, 489 (Tex. App.—Fort Worth 2008, pet. denied). However, in termination suits initiated by a private party, such as the child's other parent, an indigent parent is *not* statutorily entitled to appointment of counsel. *See In re J.C.*, 250 S.W.3d at 489. Instead, in private termination cases, the trial court is authorized to appoint an attorney ad litem to represent an indigent parent, but this authority is discretionary with the trial court, not mandatory. *See* TEX. FAM. CODE § 107.021(a)(2); *In re J.C.*, 250 S.W.3d at 489; *In re H.D.D.B.*, 2022 WL 2251655, at *8.

concise argument for the contentions made, with appropriate citations to authorities and to the record"). He also cites no authorities in support of his statement that the trial court's failure to appoint counsel for him violated his due process rights. Given the importance of Father's rights at stake in this parental-rights termination proceeding, we construe his brief liberally to reach the merits of his appellate issues where possible. *See* TEX. R. APP. P. 38.9; *In re H.D.D.B.*, No. 01-20-00723-CV, 2022 WL 2251655, at *4 (Tex. App.—Houston [1st Dist.] June 23, 2022, no pet.) (mem. op.).

Although Texas statutory law does not require appointment of counsel in private termination suits, the due process clause of the Fourteenth Amendment may require it. *See* U.S. CONST. amend. XIV; *In re H.D.D.B.*, 2022 WL 2251655, at *9; *In re L.F.*, No. 02-19-00421-CV, 2020 WL 2201905, at *11 (Tex. App.—Fort Worth May 7, 2020, no pet.) (mem. op.). In *Lassiter v. Department of Social Services of Durham County, North Carolina*, the United States Supreme Court addressed whether indigent parents have a due process right to appointed counsel in termination proceedings. *See* 452 U.S. 18 (1981). The Court began with the presumption that an indigent litigant has a due process right to appointed counsel "only when, if he loses, he may be deprived of his physical liberty." *Id.* at 26–27. The Court then balanced this presumption against three elements typically evaluated when determining what procedures due process requires: the private interests at stake, the government's interest, and the risk that the procedures used will lead to an erroneous decision. *Id.* at 27 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Because a parent's desire and right to "the companionship, care, custody and management of his or her children" is an important one, the parent's interest in the accuracy and justice of the decision to terminate parental rights is "commanding." *Id.* The parent has an additional interest if the termination petition contains allegations of abuse or neglect upon which future criminal charges could be based. *Id.* at 32. The State has a *parens patriae* interest in preserving and promoting the

12

welfare of children, *see Santosky v. Kramer*, 455 U.S. 745, 766 (1982), and thus the State shares the parent's interest in an accurate and just decision. *See Lassiter*, 452 U.S. at 27–28; *see also In re K.S.L.*, 538 S.W.3d 107, 114 (Tex. 2017) (stating that State's interest in "just decision is largely coextensive with the parents' interests"); *In re K.L.*, 91 S.W.3d 1, 10 (Tex. App.—Fort Worth 2002, no pet.) (noting that *parens patriae* interest "favors preservation, not severance, of natural familial bonds").

Parents, children, and the State have an interest in resolving termination cases as expeditiously as reasonably possible to reduce the amount of instability in the children's lives. *In re J.F.C.*, 96 S.W.3d 256, 274 (Tex. 2002); *In re K.L.*, 91 S.W.3d at 10 (noting that State has interest in ensuring termination proceedings are not unreasonably delayed to avoid "prolonged uncertainty" for child). "The child's best interest is inherently threatened by undue uncertainty and delay in finally determining where the child will live and who will raise her." *In re K.S.L.*, 538 S.W.3d at 115. The State also has an economic interest in avoiding the expense of appointed counsel and the cost of lengthened proceedings that may ensue if the parent is represented by counsel. *Lassiter*, 452 U.S. at 28. The State's pecuniary interest is "legitimate," but it is not significant enough to overcome the parent's strong and important interest in maintaining parental rights. *Id.*

Courts must also consider the risk that the parent might be erroneously deprived of his parental rights because he is not represented by counsel.[6] *Id.* A relevant consideration with respect to this interest is whether expert medical or psychiatric testimony, "which few parents are equipped to understand and fewer still to confute," is presented. *Id.* at 30. Courts should also consider whether the case presents "troublesome points of law, either procedural or substantive," for which counsel could make "a determinative difference" or whether the "absence of counsel's guidance" on a particular point "render[s] the proceedings fundamentally unfair." *Id.* at 32–33.

The *Lassiter* Court summarized its discussion of the relevant factors and reasoned:

> [T]he parent's interest is an extremely important one (and may be supplemented by the dangers of criminal liability inherent in some termination proceedings); the State shares with the parent an interest in a correct decision, has a relatively weak pecuniary interest, and, in some

---

[6] In a case in which the Department of Family and Protective Services sought termination of parental rights, the Texas Supreme Court noted that the Texas Legislature has "enacted a comprehensive statutory scheme to ensure that termination trials result in a correct decision." *In re B.L.D.*, 113 S.W.3d 340, 353 (Tex. 2003). For example, a termination petition must provide notice to all parties by alleging the statutory grounds for termination and that termination is in the children's best interest; the findings supporting termination must be made by clear and convincing evidence; and legal and factual sufficiency challenges are considered under a heightened standard of appellate review. *Id.* at 353–54. The court also noted an additional procedural safeguard to ensure termination proceedings result in the correct decision: "A trial court must appoint counsel for indigent parents opposing termination." *Id.* at 353. As discussed above, however, the Legislature has not granted this right of counsel to indigent parents in private termination proceedings.

14

but not all cases, has a possibly stronger interest in informal procedures; and the complexity of the proceeding and the incapacity of the uncounseled parent could be, but would not always be, great enough to make the risk of an erroneous deprivation of the parent's rights insupportably high.

If, in a given case, the parent's interests were at their strongest, the State's interests were at their weakest, and the risks of error were at their peak, it could not be said that the *Eldridge* factors did not overcome the presumption against the right to appointed counsel, and that due process did not therefore require the appointment of counsel.

*Id.* at 31; *see M.L.B. v. S.L.J.*, 519 U.S. 102, 123 (1996) ("When deprivation of parental status is at stake, however, counsel is sometimes part of the process that is due."). However, the Court refused to hold that due process "requires the appointment of counsel in every parental termination proceeding." *Lassiter*, 452 U.S. at 31. Instead, the question whether due process requires appointment of counsel for an indigent parent in a termination proceeding is "to be answered in the first instance by the trial court, subject, of course, to appellate review." *Id.* at 31–32; *see In re R.J.C.*, No. 04-09-00106-CV, 2010 WL 816188, at *3 (Tex. App.—San Antonio Mar. 10, 2010, no pet.) (mem. op.) ("Whether due process calls for the appointment of counsel for indigent parents in termination proceedings is left to the sound discretion of the trial court.").

## B. *Analysis*

The proceeding to terminate Father's parental rights was filed by Mother and Stepfather, not the Department of Family and Protective Services or another

15

governmental entity. As a result, because this is a private termination case, Father, even though he is incarcerated and indigent, is not statutorily entitled to appointment of counsel. *See In re J.C.*, 250 S.W.3d at 489. Father requested appointment of counsel, and the trial court had discretion to grant that request, but the court was not statutorily mandated to grant the request and appoint counsel for Father. *See* TEX. FAM. CODE § 107.021(a)(2); *In re J.C.*, 250 S.W.3d at 489; *In re H.D.D.B.*, 2022 WL 2251655, at \*8. We therefore turn to whether the failure to appoint counsel for Father violated his due process rights under the Fourteenth Amendment.

As the United States Supreme Court has acknowledged, Father has an "important" interest in maintaining the "companionship, care, custody and management" of his children, and his interest in the accuracy of this proceeding, which sought to terminate his parental rights forever, is "commanding." *See Lassiter*, 452 U.S. at 27. This "fundamental" right, *see In re D.T.*, 625 S.W.3d 62, 69 (Tex. 2021), is "far more precious than any property right." *Santosky*, 455 U.S. at 758–59; *In re J.F.C.*, 96 S.W.3d at 273. As in *Lassiter*, however, the termination petition did not contain any allegations that Father abused or neglected the children, such that, in addition to the termination proceedings, he could also be subject to future criminal prosecution. *See* 452 U.S. at 32 (noting that termination petition contained no allegations of abuse or neglect that could form basis for criminal liability, and therefore indigent mother could not argue that she needed assistance of counsel for

16

that reason); *In re L.F.*, 2020 WL 2201905, at *12 (concluding that due process did not require appointment of counsel for indigent mother in part because termination petition "contained no allegations against [m]other upon which criminal charges could be based"). Thus, although Father has an "extremely important" interest at stake, his interests are not "at their strongest." *See Lassiter*, 452 U.S. at 31.

At trial, the only witnesses were Mother, Father, and Stepfather. This was therefore not a situation in which Father was faced with cross-examining expert witnesses without the assistance of counsel. Additionally, although Mother offered several exhibits, these exhibits consisted of an account activity report prepared by the Office of the Attorney General, the judgments for Father's criminal convictions, Mother and Father's divorce decree, and the March 2017 order modifying the parent-child relationship to require supervised visitation. No complicated medical or psychiatric reports or other evidence was admitted. *See id.* at 32 (noting that while state entity seeking termination was represented by counsel at trial, no expert witnesses testified); *see also In re L.F.*, 2020 WL 2201905, at *12 (noting, in concluding that due process did not require appointment of counsel in private termination suit, that no expert witnesses testified); *In re J.E.D.*, No. 11-19-00166-CV, 2019 WL 5617645, at *3 (Tex. App.—Eastland Oct. 24, 2019, no pet.) (mem. op.) (same); *In re T.L.W.*, No. 12-10-00401-CV, 2012 WL 1142475, at *2 (Tex.

17

App.—Tyler Mar. 30, 2012, no pet.) (mem. op.) (same); *In re R.J.C.*, 2010 WL 816188, at *4 (same).

Some of Mother's testimony—including her testimony concerning the circumstances of Father's criminal offenses—was not based on her own personal knowledge, and was therefore objectionable, but Father did not object. Father acknowledged in his testimony that the complainants of his aggravated robbery and kidnapping offenses were his grandparents and that a firearm was involved, although Father testified that the gun was not his, and instead he took his grandfather's gun away from him. There is no indication that the judgments reflecting Father's convictions and sentences, the testimony concerning Father's failure to pay child support, and Mother's and Stepfather's testimony concerning Stepfather's relationship with the children were inadmissible. *See In re T.L.W.*, 2012 WL 1142475, at *2 ("[A]lthough some objectionable evidence may have been admitted, there is no indication that the evidence of [father's] convictions, his child support records, or [mother's] and her new husband's testimony indicating that termination was in the children's best interest was inadmissible."); *In re R.J.C.*, 2010 WL 816188, at *4 (same).

Additionally, Father demonstrated a desire to contest the proceedings and retain his parental rights. In several filings with the trial court, he stated that he wanted to maintain a relationship with the children and that he had tried to do so by

18

sending the children letters and gifts while he was incarcerated, but Mother was uncooperative. Father offered, and the trial court admitted, three letters that Mother wrote to him during his incarceration and the pendency of the termination proceeding. In these letters, Mother acknowledged that Father had sent the children letters, artwork, and gifts, and she also acknowledged that Father wanted to remain a part of the children's lives. Although the parent's desire to contest the proceedings and parent their children is a factor that we consider, that circumstance alone does not entitle a parent to appointment of counsel. *See In re T.L.W.*, 2012 WL 1142475, at *2; *In re R.J.C.*, 2010 WL 816188, at *4.

We must also consider whether the case presented any "specially troublesome points of law, either procedural or substantive." *See Lassiter*, 452 U.S. at 32; *In re T.L.W.*, 2012 WL 1142475, at *2 (considering whether case involved any "troublesome points of law to address"); *In re R.J.C.*, 2010 WL 816188, at *4 (same). Mother sought termination of Father's parental rights based on three statutory predicate grounds: Family Code section 161.001(b)(1)(C), (F), and (Q). The trial court ultimately terminated Father's parental rights based on subsections (F) and (Q).

A trial court may terminate a parent's rights under subsection (F) if it finds, by clear and convincing evidence, that the parent failed to support the child in accordance with the parent's ability during a period of one year ending within six

19

months of the date of the filing of the petition. TEX. FAM. CODE § 161.001(b)(1)(F). "One year" means twelve consecutive months, and this period must begin no earlier than eighteen months before the date of filing the termination petition. *In re J.G.S.*, 574 S.W.3d 101, 117 (Tex. App.—Houston [1st Dist.] 2019, pet. denied); *In re F.E.N.*, 542 S.W.3d 752, 765 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) (concluding that relevant time period under subsection (F) was "any twelve consecutive months" between September 1, 2011, and March 1, 2013, which was date termination petition was filed), *pet. denied*, 579 S.W.3d 74 (Tex. 2019) (per curiam).

The party seeking termination bears the burden to establish that the parent had the ability to support the child during each month of the twelve-month period. *In re J.G.S.*, 574 S.W.3d at 117; *In re E.M.E.*, 234 S.W.3d 71, 72 (Tex. App.—El Paso 2007, no pet.); *In re T.B.D.*, 223 S.W.3d 515, 518 (Tex. App.—Amarillo 2006, no pet.). A previous child-support order is not evidence of a parent's ability to pay under subsection (F). *In re D.M.D.*, 363 S.W.3d 916, 920 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *In re D.S.P.*, 210 S.W.3d 776, 781 (Tex. App.—Corpus Christi–Edinburg 2006, no pet.) (concluding that child support order "should not be afforded any relevance in a termination proceeding involving section 161.001[b](1)(F)"). The parent does not bear the burden to disprove ability to pay. *See in re D.M.D.*, 363 S.W.3d at 920. Without clear and convincing evidence of the

20

parent's ability to support their child during the statutory period, the trial court may not order termination under subsection (F). *In re J.G.S.*, 574 S.W.3d at 117.

Mother filed suit to terminate Father's parental rights on August 16, 2020. Thus, the relevant time period for determining if Father supported the children in accordance with his ability is February 16, 2019, to August 16, 2020. *See id.* (stating that "one year" means twelve consecutive months and period must begin no earlier than eighteen months before filing of termination petition). Mother bore the burden to establish, by clear and convincing evidence, that Father had the ability to support the children for each of twelve consecutive months during this time period, but Father failed to do so.

The divorce decree, entered in May 2013, imposed a $450 per month child support obligation on Father. A financial activity record maintained by the Attorney General's office reflected that Father made some payments throughout 2013, 2014, and 2015. Father then made a $650 payment in January 2016, an $11,413.35 payment in January 2018, and a $1,455.48 payment in August 2021.[7] He made no other payments, including no payments at all from February 2019 through August 2020.

---

[7] Mother confirmed that she received a child support payment in January 2016 and August 2021, but she disputed receiving a payment in January 2018. She agreed that she received no child support payments from Father in 2019 and 2020.

It is undisputed that Father was incarcerated throughout the pendency of the termination proceedings. Father testified that he was arrested for the incident that formed the basis for his convictions in June 2018, and he has been incarcerated since then. Father was convicted in February 2020. When asked if he has voluntarily paid child support since he has been incarcerated, Father responded, "I haven't had the means." *See id.* at 118 (concluding that paternal grandmother did not establish father's ability to pay when father was incarcerated for entire statutory period under subsection (F) and he had no access to military pay during this time); *In re E.M.E.*, 234 S.W.3d at 74 (concluding evidence was insufficient to support finding under subsection (F) when evidence was undisputed father had no income while incarcerated during relevant time period); *In re T.B.D.*, 223 S.W.3d at 518 (concluding that termination under subsection (F) was not appropriate when father was incarcerated during entire statutory time period, father testified he had no ability to support his child while in prison, and no evidence was presented of father's ability to support child). Mother's counsel did not ask Father any questions about his assets, nor did counsel ask any questions about any funds Father may have received or had access to from February 16, 2019, through August 16, 2020.

At the close of the hearing, the trial court stated its intentions to find that Father committed at least two statutory predicate acts and that termination of his parental rights was in the children's best interest. The court mentioned subsection

22

(F) and stated, "but you have not provided support." The trial court, Father, and

Mother's counsel then had the following exchange:

Father: In July I made [Mother's counsel] and [Mother] a judgment for $26,000 for child support, uncontested, and they're now going after the foreclosure of my house, the excess funds to pay that $26,000. So my child support will be paid in full once that—once that excess proceeds comes to [Mother].

The Court: Is the house on the market?

Father: No. It was foreclosed in 2018 when I got incarcerated.

The Court: Okay. So how did you know that there's any excess proceeds?

Father: Because [Mother's counsel] has provided me with the information.

. . . .

Mother's Counsel: There is [an] application for a writ of judgment—or writ of garnishment that is awaiting your signature in the original SAPCR, it was the original SAPCR case with an A on it. We've been awaiting your signature on that, although I will add that per the Code, he's not supporting the child during—what he's talking about is that application garnishment— garnishment and that was for—he had property that was foreclosed on in 2018.

I would just add to the Court though, that the mere evidence of the fact that he's owned—that he owned the property that he could have sold to pay the child support establishes that he had the ability to pay child support.

The Court: All right. And do you have any response to that, sir?

Father:          That's not the case. Nobody—I couldn't sell my property if I was living there. I would have nowhere to live.

Although Father and Mother's counsel agreed that Father's house had been foreclosed upon in 2018 and there were excess proceeds from the foreclosure sale, the record is not clear when the sale happened, whether Father had access to the excess proceeds, or whether he even knew about the excess proceeds during the time period relevant to subsection (F). Mother bore the burden to establish that Father had the ability to pay support during the statutory time period but failed to do so. *See In re J.G.S.*, 574 S.W.3d at 117. Based on this record, we cannot say that, had counsel represented Father, counsel could not have "made a determinative difference" at trial. *Cf. Lassiter*, 452 U.S. at 32–33 (stating that while hearsay evidence was admitted at trial and mother "no doubt left incomplete her defense," weight of evidence that mother had little interest in relationship with her child "was sufficiently great that the presence of counsel for [mother] could not have made a determinative difference").

The trial court also terminated Father's parental rights based on subsection (Q). This subsection allows a court to terminate a parent's rights if it finds by clear and convincing evidence that the parent knowingly engaged in criminal conduct that has resulted in the parent's (1) conviction of an offense, and (2) confinement or imprisonment and inability to care for the child for not less than two years from the

date of filing the petition for termination. TEX. FAM. CODE § 161.001(b)(1)(Q). If the parent is convicted and sentenced to serve at least two years' confinement and will not be able to provide for the child during that time, a party may seek termination of the parent's rights under subsection (Q). *In re A.V.*, 113 S.W.3d 355, 360 (Tex. 2003); *In re A.R.*, 497 S.W.3d 500, 503 (Tex. App.—Texarkana 2015, no pet.).

Establishing "inability to care for the child" is not met by merely showing prolonged incarceration. *In re J.G.S.*, 574 S.W.3d at 118. If that were sufficient, then termination of parental rights "could become an additional punishment automatically imposed along with imprisonment for almost any crime." *In re E.S.S.*, 131 S.W.3d 632, 639 (Tex. App.—Fort Worth 2004, no pet.). Thus, evidence of incarceration for at least two years "is only the first of a three-step analysis." *In re J.G.S.*, 574 S.W.3d at 118.

Once the party seeking termination has presented evidence of criminal conduct by the parent resulting in confinement for at least two years, the burden of production shifts to the parent to provide some evidence of how the parent will provide care for the child during the period of confinement. *Id.* at 119; *see In re C.L.E.E.G.*, 639 S.W.3d 696, 700 (Tex. 2022) (per curiam) (concluding that sufficient evidence supported termination under subsection (Q) when parent introduced "no evidence" of efforts to arrange for child's care "during his remaining imprisonment"). The parent may meet this burden of production by presenting some

evidence that the parent has arranged with another person for that person to provide care for the child during the parent's period of confinement. *In re J.G.S.*, 574 S.W.3d at 119; *In re Caballero*, 53 S.W.3d 391, 396 (Tex. App.—Amarillo 2001, pet. denied). The parent must prove the proposed caregiver's agreement to provide care. *In re J.G.S.*, 574 S.W.3d at 119.

The Texas Supreme Court has stated:

Absent evidence that the non-incarcerated parent agreed to care for the child on behalf of the incarcerated parent, merely leaving a child with a non-incarcerated parent does not constitute the ability to provide care. If it did, then termination under subsection Q could not occur in any instance where one parent is not incarcerated and is willing and able to care for the child. [The mother] is [the child's] sole managing conservator, and as such, she has both the obligations of a parent and specific statutory rights. It does not follow that the possessory conservator's obligations are satisfied by allowing the sole managing conservator to be the exclusive caregiver.

*In re H.R.M.*, 209 S.W.3d 105, 110 (Tex. 2006) (per curiam); *In re J.G.S.*, 574 S.W.3d at 119 (stating that parent "must demonstrate that the care is being provided on behalf of the parent, not out of an existing duty or inclination to care for the child"). When determining whether the parent has an inability to care for the child, we consider factors including the "availability of financial and emotional support from the incarcerated parent." *In re B.M.R.*, 84 S.W.3d 814, 818 (Tex. App.—Houston [1st Dist.] 2002, no pet.).

If the parent meets this burden of production, the burden shifts back to the party seeking termination, who has the burden of persuasion to show that the parent's

26

provision or arrangement will not adequately satisfy the parent's duty to the child. *In re J.G.S.*, 574 S.W.3d at 119–20; *In re B.D.A.*, 546 S.W.3d 346, 358 (Tex. App.— Houston [1st Dist.] 2018, pet. denied).

Father does not deny that he has been sentenced to confinement for nine years and Mother presented evidence of his sentences for five criminal offenses at trial. Thus, the first step in the analysis under subsection (Q) is satisfied. *See* TEX. FAM. CODE § 161.001(b)(1)(Q); *In re A.V.*, 113 S.W.3d at 360. However, this is "only the first of a three-step analysis." *In re J.G.S.*, 574 S.W.3d at 118. After Mother presented evidence that Father knowingly engaged in criminal conduct that resulted in his imprisonment for at least two years, the burden of production shifted to Father to present some evidence of how he would provide care for the children during his period of confinement. *See id.* at 119. Father could meet this burden by providing evidence that he arranged with another person for that person to provide care for the children. *See id.* Father, however, presented no such evidence.

While Mother, as the party seeking termination, bore the ultimate burden of persuasion to establish the statutory elements of subsection (Q) by clear and convincing evidence, once she presented evidence that he had engaged in criminal conduct resulting in imprisonment for at least two years, Father also bore a burden of production. *See In re C.L.E.E.G.*, 639 S.W.3d at 700; *In re J.G.S.*, 574 S.W.3d at 119. Thus, to avoid termination under this subsection, Father was not just required

to defend himself against the allegation that he violated subsection (Q). Instead, he had his own evidentiary burden. We conclude that this case presented "troublesome points of law" and that counsel for Father could have "made a determinative difference." *See Lassiter*, 452 U.S. at 32–33.

When we consider all the circumstances, particularly the importance of Father's interest at stake, his desire to contest the proceedings and maintain a relationship with his daughters, and the challenges of defending against termination under subsections (F) and (Q) in this case, we conclude that the trial court should have appointed counsel to represent Father as a matter of due process. *See id.* at 31–32. We hold that the trial court erred by failing to appoint counsel to represent Father in this private termination proceeding.

## Conclusion

We reverse the trial court's order terminating Father's parental rights to Iris and Catherine and remand the case for further proceedings.

April L. Farris
Justice

Panel consists of Justices Goodman, Countiss, and Farris.

Justice Countiss, dissenting.